HUMBERTO PAGÁN HERNÁNDEZ, demandante y recurrido, *v.* UNIVERSIDAD DE PUERTO RICO, ARTURO MORALES CARRIÓN y OTROS, demandados y recurrentes.

*Número:* R-76-55 *Resuelto:* 16 de octubre de 1978

722

724

*José A. Andréu García, Manuel E. Andréu García* y *Jaime A. Rodríguez Lecoeur,* abogados de los recurrentes; *Manuel E. Moraza Choisne, Roberto José Maldonado, Luis F. Abreu Elías, Javier Cuevas Silva* y *Julio Torres,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

La Universidad de Puerto Rico decretó la expulsión permanente de un joven estudiante a base de cargos que le imputaron haber participado en actos de violencia ocurridos en el *campus* de Río Piedras el 11 de marzo de 1971 y haber ocasionado la muerte de un oficial de la Policía Estatal. La única prueba que conectó al estudiante con estos hechos fue la declaración de un teniente de dicho Cuerpo. En *Pagán Hernández* v. *Alcaide,* 102 D.P.R. 101 (1974), resolvimos que esa misma prueba no podía servir de base para encausar criminalmente al estudiante. Concluimos que por no ser confiable la identifi-

cación que se hizo del estudiante, no era admisible dicho testimonio y su admisión constituía una violación del debido procedimiento de ley. Nos toca resolver ahora si la determinación administrativa hecha en 1971, que decretó la expulsión, constituye cosa juzgada e impide que ante los tribunales de justicia se investigue la suficiencia de dicha prueba para sostener el decreto de expulsión. Resolvemos, en consideración a los particulares hechos de este caso, que la decisión administrativa no constituye cosa juzgada y que la prueba es insuficiente para sostener el dictamen administrativo.

## Los Hechos

En el presente recurso examinamos una sentencia del Tribunal Superior, Sala de San Juan, que ordenó la inmediata reinstalación de Humberto Pagán Hernández como estudiante regular del Recinto de Río Piedras de la Universidad de Puerto Rico. La acción judicial en que se produjo dicha sentencia tiene el siguiente trasfondo de hechos.

El 11 de marzo de 1971 el Recinto de Río Piedras de la Universidad de Puerto Rico se vio perturbado por actos de violencia generados como consecuencia de una protesta estudiantil contra la presencia en dicho Recinto del programa de ciencia y táctica militar conocido como R.O.T.C. Poco después del mediodía intervino la Fuerza de Choque de la Policía de Puerto Rico al mando del comandante Juan B. Mercado. Cerca de la armería del R.O.T.C., donde se hallaban congregados numerosos estudiantes, se produjo una balacera en que fue mortalmente herido el comandante Mercado.[1] El día siguiente, 12 de marzo, el entonces Rector don Pedro José Rivera notificó por carta al estudiante Humberto Pagán Her-

[1] Así surge de la transcripción de la prueba testifical vertida ante la Junta de Disciplina de la Universidad de Puerto Rico que forma parte de los autos originales del caso ante nos.

nández que le suspendía sumariamente como estudiante del Recinto de Río Piedras, a la vez que le formulaba los siguientes cargos por violación de los incisos 1, 4, 6, 7 y 10 del Art. 10 del Reglamento General de Estudiantes de la Universidad, (²) en relación con los incidentes del 11 de marzo:

"1. Su participación activa junto a un grupo de estudiantes en los desórdenes y actos de violencia cometidos en el Recinto ese día.

"2. Posesión y uso de arma de fuego con el fin de causar daños a otras personas, ocasionándole la muerte a un miembro de la Policía Estatal.

"3. Interrumpir y perturbar las tareas y funciones de la Universidad en dicho día."

Los cargos fueron ventilados ante la Junta de Disciplina de la Universidad de Puerto Rico en vistas celebradas entre el 12 de mayo y el 30 de junio de 1971. La única prueba que

---

(²) Las citadas disposiciones expresan:

"A. Los siguientes actos constituyen infracciones de las normas esenciales al orden y a la convivencia universitaria y acarrean sanciones disciplinarias:

"1. Violaciones al Reglamento General de Estudiantes o al Reglamento del Recinto.

"2. . . . . . . . .

"3. . . . . . . . .

"4. Conducta impropia e irrespetuosa en el salón de clase o en el Recinto.

"5. . . . . . . . 

"6. Interrumpir, obstaculizar o perturbar las tareas regulares de la Universidad o la celebración de actos o funciones debidamente autorizados. La norma anterior es igualmente aplicable cuando los actos de inscripción [sic], obstaculización o perturbación se realizan fuera del Recinto.

"7. La celebración dentro de la Universidad de actos no autorizados por los funcionarios universitarios correspondientes.

"8. . . . . . . . .

"9. . . . . . . . .

"10. Causar daños maliciosos a la propiedad universitaria."

relacionó al querellado con las actuaciones que se le imputaron fue el testimonio de José Rafael Atilano, primer teniente de la Policía adscrito a la Fuerza de Choque que participó en los sucesos del 11 de marzo. Dicha Junta por votación de tres a dos, halló probados los cargos y recomendó la separación definitiva del querellado como estudiante de la Universidad de Puerto Rico. Así lo decretó finalmente el Lcdo. José R. Cancio, funcionario designado por el Rector para decidir los casos en que interviene la Junta, decisión que le fue debidamente notificada al querellado el 12 de agosto de 1971.

En el ínterin, el 17 de marzo de 1971 un Juez de Distrito, basado en la declaración del testigo, teniente José Rafael Atilano, determinó que existía causa probable contra Humberto Pagán Hernández por los delitos de asesinato en primer grado e infracciones de los Arts. 8 y 6 de la Ley de Armas y ordenó su arresto y detención. En esa misma fecha Pagán Hernández presentó solicitud de hábeas corpus ante el Tribunal Superior, Sala de Hato Rey, en que atacó la validez de dicha determinación de causa probable. Mientras tanto, quedó en libertad bajo fianza.

Durante la ventilación del recurso de hábeas corpus prestó testimonio el teniente Atilano, siendo su declaración la única prueba que, al igual que en la vista ante la Junta de Disciplina de la Universidad, conectaba al querellado con los sucesos del 11 de marzo. Contra la sentencia que anuló el auto expedido apeló Pagán Hernández ante nos por mediación de sus abogados.

Mientras tanto, Pagán Hernández se había ausentado de Puerto Rico. Fue localizado en el Canadá, ante cuyos tribunales promovió el Estado Libre Asociado procedimientos de extradición que no tuvieron éxito. Allá fue a prestar testimonio nuevamente el teniente Atilano, habiendo fallado el

tribunal canadiense de instancia, sostenido en apelación por la Federal Court of Appeals de aquel país, que su testimonio era insuficiente para sostener una determinación de causa probable. (³) Pagán Hernández regresó voluntariamente a Puerto Rico en diciembre de 1973. Fue inmediatamente detenido.

En el recurso de apelación pendiente ante nos para revisar la sentencia del hábeas corpus que sostuvo la determinación de causa probable, recayó decisión final el 31 de mayo de 1974 que revocó dicha sentencia. (102 D.P.R. 110.) Resolvimos que el procedimiento utilizado para identificar a Pagán Hernández "estuvo claramente viciado de nulidad." La identificación por fotografías se había hecho luego de una confidencia recibida por la Policía que le señalaba como el culpable de la muerte del comandante Mercado, y las fotografías utilizadas, cuyo examen por los abogados de Pagán Hernández no fue permitido en la vista del hábeas corpus, estaban contenidas en tarjetas de identificación de estudiantes de la Universidad que además contenían sus datos personales. Reiteramos, además, los pronunciamientos hechos por el Juez Asociado Señor Dávila en opinión emitida el 21 de marzo de 1974, en que se señaló:

". . . La prueba presentada sobre la identificación del peticionario no es confiable. La identificación de un acusado, si no es confiable, no es admisible en evidencia, cuestión a ser determinada por el tribunal como cuestión de derecho ya que envuelve una violación del debido procedimiento de ley." *Pagán Hernández* v. *Alcaide,* 102 D.P.R. 101, 104 *ab initio* (1974).

Resueltas en esa forma las causas criminales, el 1 de octubre de 1974 Pagán Hernández formuló solicitud de readmi-

---

(³) La relación contenida en éste y los dos párrafos precedentes surgen de nuestro expediente O-71-223, que hemos examinado, en que se produjo nuestra decisión de *Pagán Hernández* v. *Alcaide,* 102 D.P.R. 101 (1974).

sión a la Universidad de Puerto Rico, Recinto de Río Piedras, que le fue denegada y devuelta por el Registrador el 7 de dicho mes amparándose en el decreto de separación de 12 de agosto de 1971. El 26 de noviembre de 1974, por carta al Rector Ismael Rodríguez Bou, reprodujo su solicitud de readmisión el querellado. El Rector contestó el 9 de diciembre de 1974 mediante carta en que manifestó que por haber sido separado definitivamente de la Universidad en virtud de una decisión final de la Junta de Disciplina, el asunto debía "elevarse ante el Presidente de la Universidad a tenor con los 'Procedimientos de apelación de diferentes niveles jerárquicos del sistema universitario.' " Le conminó a presentar ante el Presidente el correspondiente escrito de apelación y a tales fines le envió copia de los "Procedimientos de apelación" mencionados.

Por carta de fecha 2 de junio de 1975 se formuló la petición de readmisión al Presidente de la Universidad. El 25 de junio de 1975 el Presidente contestó y rechazó la solicitud a base de que, (1) el término para establecer una apelación comenzó a correr a partir de la decisión aprobatoria de las determinaciones de la Junta de Disciplina (12 de agosto de 1971); (2) que el "Apartado 1ro. del Procedimiento Temporero Para Tramitar Apelaciones ante el Presidente de la Universidad de Puerto Rico" establece un plazo de quince días a partir de la notificación de la decisión para solicitar del Presidente de la Universidad su revisión, término que "ha decursado en exceso"; y, (3) que el peticionario estaba impedido por incuria (*laches*) de ejercitar la acción, por haber transcurrido "un término completamente irrazonable, aun cuando el mismo se comenzase a contar a partir del 9 de diciembre de 1974, en que el Rector del Recinto de Río Piedras le envió a su representante legal copia de las normas que rigen este procedimiento, en las que señala el término pertinente al efecto."

El 30 de septiembre de 1975 reprodujo su solicitud de readmisión ante el Consejo de Educación Superior mediante carta que el Secretario Ejecutivo refirió al Presidente de dicho Cuerpo el 7 de octubre siguiente. Como no se le notificara otra acción, el 30 de diciembre de 1975 Pagán Hernández instó demanda ante el Tribunal Superior contra la Universidad de Puerto Rico, su Presidente, el Rector y el Registrador del Recinto de Río Piedras, y contra el Consejo de Educación Superior, en que reclamó se ordenara su readmisión.

Los demandados comparecieron oportunamente para oponerse a la pretensión del demandante. La controversia quedó centrada en dos planteamientos: (1) suficiencia de la prueba aportada ante la Junta de Disciplina para relacionar a Humberto Pagán Hernández con los sucesos del 11 de marzo de 1971, frente a nuestra decisión en *Pagán Hernández* v. *Alcaide*, supra y (2) si constituye cosa juzgada la decisión de la Junta y estaba impedido el Tribunal de pasar sobre el asunto. Los mismos planteamientos son reproducidos ante nos en recurso contra la sentencia que se negó a desestimar la demanda por tales planteamientos y ordenó la reinstalación del demandante como estudiante de la Universidad.

### La Defensa de Cosa Juzgada o Res Judicata

Procederemos a resolver en primer lugar el planteamiento sobre cosa juzgada pues, de ser éste procedente, sería innecesario discutir el aspecto de suficiencia de la prueba en el ámbito administrativo.

■ La doctrina de cosa juzgada, de estirpe romana, [4] tiene base estatutaria en el Art. 1204 del Código Civil (31 L.P.R.A. sec. 3343), que dispone en lo aquí pertinente:

---

[4] *Lausell Marxuach* v. *Díaz de Yáñez,* 103 D.P.R. 533, 535 (1975); *Pérez* v. *Bauzá,* 83 D.P.R. 220, 225 (1961).

"*. . . . . . . .*

Contra la presunción de que la cosa juzgada es verdad, sólo será eficaz la sentencia ganada en juicio de revisión.

Para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso resuelto por la sentencia y aquel en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron.

*. . . . . . . ."*

■ En *Pérez* v. *Bauzá*, 83 D.P.R. 220, 225 (1961), expresamos los fundamentos de esta doctrina: "... por un lado, el interés del Estado en que se le ponga fin a los litigios, que no se eternicen las cuestiones judiciales . . . y por otro lado, la deseabilidad de que no se someta en dos ocasiones a un ciudadano a las molestias que supone litigar la misma causa." Con ella se persigue dar la debida dignidad a las actuaciones de los tribunales. *Bolker* v. *Tribunal Superior*, 82 D.P.R. 816, 832 (1961). Como señala Manresa: "... el fundamento de la cosa juzgada no está en una pretensión de infalibilidad en el juzgador, ni menos en el intento de ocultar sus errores, sino que se encuentra en la esencia misma de la resolución judicial, que no merecería tal nombre ni tendría fuerza y resultado, si no se fortaleciera de ese modo. Es por tanto, una consecuencia directa de la autoridad necesaria al fallo, y en un orden eminentemente práctico tiene el fundamento indiscutible de que sin esa fuerza atribuida a lo juzgado, los pleitos nunca tendrían fin . . . ." Manresa, *Comentarios al Código Civil Español*, Tomo VIII, vol. 2, Madrid, ed. 1967, pág. 279. Es una regla de "justicia fundamental y sustancial, rodeada de interés público . . . ." *Bolker*, supra.

■ El efecto de la doctrina de cosa juzgada, cuando ésta aplica, es que la sentencia dictada en un pleito anterior impide que se litiguen en un pleito posterior entre las mismas

partes y sobre la misma causa de acción y cosas, las cuestiones ya litigadas y adjudicadas y aquellas que pudieron haber sido litigadas y adjudicadas con propiedad en la acción anterior. *Mercado Riera* v. *Mercado Riera*, 100 D.P.R. 940, 950 (1972); *Isaac Sánchez* v. *Universal C.I.T. Credit*, 95 D.P.R. 372, 382 (1967); *Capó Sánchez* v. *Srio. de Hacienda*, 92 D.P.R. 837 (1965); *Riera* v. *Pizá*, 85 D.P.R. 268, 274 (1962); *Sastre* v. *Cabrera*, 75 D.P.R. 1, 3 (1953); *Manrique Gil* v. *Goffinet*, 37 D.P.R. 336, 341 (1927).

■ El caso de autos plantea el punto novel en nuestra jurisprudencia sobre la aplicación de la doctrina de cosa juzgada a procedimientos administrativos. La aplicación de tal doctrina en el campo administrativo tiene las siguientes vertientes: (a) su aplicación dentro de la misma agencia, a sus propias decisiones; (b) su aplicación interagencialmente; es decir, de una agencia a otra, y (c) su aplicación entre las agencias y los tribunales.[5] El caso de autos plantea este último aspecto.

■ En el Derecho norteamericano existía una tendencia a rechazar en términos absolutos la aplicación de la doctrina de cosa juzgada a las decisiones administrativas. Véanse, por ejemplo, *Pearson* v. *Williams*, 202 U.S. 281

---

[5] El siguiente es un interesante planteamiento del problema de la aplicación de la doctrina de cosa juzgada al ámbito administrativo:

"La doctrina de cosa juzgada tiene dos aspectos que presentan problemas distintos en el ámbito del Derecho administrativo. En primer lugar está la interrogante de cuándo se puede impugnar una decisión administrativa en los tribunales. En segundo lugar, surge el problema de cuándo y por quién se puede reconsiderar una determinación administrativa, y aun llegar a una nueva decisión, en la misma agencia que originalmente la había hecho. Diferentes conceptos rigen en las dos situaciones, por lo que una decisión puede ser cosa juzgada en una, y no serlo necesariamente en otra." (Traducción nuestra.) Ganz, *Estoppel and Res Judicata in Administrative Law Public Law* 237 (1965).

(1906) y *Churchill Tabernacle* v. *F.C.C.*, 160 F.2d 244 (1947), cuyas expresiones fueron usadas en varias decisiones para fundamentar la exclusión de la doctrina de cosa juzgada del ámbito administrativo. 2 Davis, *Administrative Law Treatise*, sec. 18.02 (1958). En *United States* v. *Utah Construction Co.*, 384 U.S. 394, 421–422 (1966), el Tribunal Supremo federal finalmente aclaró que rechazaba la posición que hallaba a la doctrina de cosa juzgada inaplicable a las decisiones administrativas. Estableció que dicha doctrina es aplicable a decisiones administrativas en casos apropiados. A tales efectos, el Tribunal Supremo dijo: ". . . [N]otamos que el resultado al cual llegamos armoniza con los principios generales del impedimento colateral. Los tribunales en ocasiones han usado lenguaje indicativo de que los principios de cosa juzgada no aplican a los procedimientos administrativos, pero semejante lenguaje es, en definitiva, demasiado abarcador. Cuando una agencia administrativa actúa en una capacidad judicial y resuelve controversias de hechos ante sí, las cuales las partes han podido litigar en forma oportuna y adecuada, los tribunales no han vacilado en aplicar la doctrina de cosa juzgada para imponer descanso en la controversia. *Sunshine Coal Co.* v. *Adkins*, 310 U.S. 381 [1940]; *Hanover Bank* v. *United States*, . . . 285 F.2d 455 [1961]; *Fairmont Aluminum Co.* v. *Commissioner*, 222 F.2d 622 [1955]; *Seatrain Lines, Inc.* v. *Pennsylvania R. Co.*, 207 F.2d 255 [1953]." *United States* v. *Utah Construction Co.*, supra.

■ Estos comentarios del Tribunal Supremo federal pusieron fin a la controversia de si aplicaba o no la doctrina de cosa juzgada al Derecho administrativo. Desde entonces la jurisprudencia norteamericana se ha desarrollado en términos de "aplicar la doctrina de cosa juzgada cuando las razones para ello estén presentes con toda su fuerza, modificarla cuando sean necesarias algunas alteraciones, y rechazarla

cuando las razones en contra de su aplicación sean de mayor peso que aquellas a su favor." Davis, *Administrative Law of the Seventies*, secs. 18.01–18.06 (1976). Dicho de otro modo, la aplicabilidad de la doctrina en el campo administrativo es flexible y depende de la naturaleza de la cuestión que se plantea en el ámbito judicial.

Pasemos a la situación ante nos. Pagán Hernández no recurrió a tiempo de la decisión de la Junta de Disciplina. Aunque el Reglamento de Estudiantes no proveía para que se recurriera de dicha determinación, existían los siguientes reglamentos que sí proveían para que la Universidad revisara sus actuaciones. "Procedimientos de la apelación en diferentes niveles jerárquicos del sistema universitario" y "Procedimiento temporero para tramitar apelaciones ante el Presidente de la U.P.R." Estos establecían, respectivamente, un término de 15 días para recurrir ante el Consejo de Educación Superior de una decisión adversa del Presidente, y un término de 15 días para recurrir ante el Presidente de una decisión adversa del Rector. Humberto Pagán incumplió dichos plazos. Apeló ante el Presidente el 2 de junio de 1975 y no es hasta el 30 de septiembre de 1975 que recurrió al Consejo de Educación Superior, luego de que el 25 de junio de 1975 el Presidente denegara su petición. Estos hechos, sin embargo, son insuficientes para justificar en este caso la aplicación de la doctrina de cosa juzgada e impedir ventilar ante los tribunales de justicia la validez del decreto administrativo.

█ Hemos reconocido varias excepciones a la aplicación de la doctrina de cosa juzgada. En *Figueroa* v. *Municipio de San Juan*, 98 D.P.R. 534, 556 (1970), reconocimos que la presunción de cosa juzgada tiene bien definidas excepciones en ley, de orden equitativo. Citamos *Pérez* v. *Bauzá*, 83 D.P.R. 220, 225 (1961); *Millán* v. *Caribe Motors Corp.*, 83

D.P.R. 494, 505, 510 (1961); *Suárez Fuentes* v. *Tribunal Superior*, 88 D.P.R. 136, 151 (1963); *Viera* v. *Comisión Hípica*, 81 D.P.R. 707, 720 (1960); *Tartak* v. *Tribl. de Distrito*, 74 D.P.R. 862, 870 (1953); *Vidal* v. *Monagas*, 66 D.P.R. 622, 631 (1946); *Riera* v. *Pizá*, 85 D.P.R. 268, 274 (1962); *Rodríguez* v. *Sucn. Pirazzi*, 89 D.P.R. 506, 518–520 (1963); *Feliciano Ruiz* v. *Alfonso Develop. Corp.*, 96 D.P.R. 108, 113 (1968).

Entre estas excepciones se encuentran aquellos casos que están permeados de consideraciones de orden público. (⁶) Los dos casos normativos en esta materia son *Pérez* v. *Bauzá*, supra, y *Millán* v. *Caribe Motors Corp.*, supra. El primero trataba de una acción filiatoria en que el demandante era un menor de edad a quien se pretendía imputar la falta de diligencia de su madre y de sus abogados. (⁷) Expresamos que los tribunales se han negado a aplicar en forma inflexible la doctrina de cosa juzgada cuando hacerlo derrotaría los fines de la justicia, especialmente si se plantean consideraciones de interés público. Y añadimos (pág. 226): "Según se ha expresado, la doctrina descansa en el principio básico de que debe propiciarse la terminación de litigios, pero si la aplicación rigurosa de la misma derrotaría en la práctica un derecho permeado en alguna forma del interés público, los tribunales se inclinan hacia la solución que garantice cumplida

(⁶) También han reconocido como excepciones a la doctrina de cosa juzgada las siguientes: una sentencia previa (la cual es nula) que fue dictada basándose en un allanamiento de partes que es nulo (*Vidal* v. *Monagas*, supra); una sentencia previa dictada sin jurisdicción (*Tartak* v. *Trib. de Distrito*, supra); una sentencia del Tribunal Superior cuya revisión se intentó pero que no se pudo lograr por razones ajenas a la voluntad del apelante (*Riera* v. *Pizá*, supra); fraude (*Suárez Fuentes* v. *Tribunal Superior*, supra); derrota de los fines de la justicia (*Feliciano Ruiz* v. *Alfonso Develop. Corp.*, supra).

(⁷) Para otro caso de filiación y el problema de *res judicata* véase *Garzot* v. *Tribunal Superior*, 90 D.P.R. 359 (1964).

justicia, en lugar de favorecer en forma rígida una ficción de ley que obedece fundamentalmente a un principio de conveniencia y orden procesal . . . . En otras palabras, la regla no es absoluta y debe siempre considerarse conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso."

En *Millán* v. *Caribe Motors*, confirmamos una sentencia que declaró con lugar una acción de rescisión de un contrato de venta condicional de un camión y concedió indemnización por daños, luego de que la vendedora reposeyó el camión por atrasos en los pagos que debían hacerse conforme al contrato. En dicho caso hubo dolo que vició el consentimiento del comprador, existían defectos formales en el contrato en contravención de la ley sobre ventas condicionales, y la primera acción (el procedimiento de reposesión) era de carácter sumario y especial, por lo que no se podía exigir inflexiblemente que se litigasen en ella otras causas ajenas a la de reposesión. Dijimos, pág. 508: "Ciertamente hay un interés tanto individual como social en que los litigios tengan fin. Sin embargo, no podemos frustrar la justicia en nombre de reglas que se originaron con el propósito de facilitar su administración."

 El recurrido invoca su derecho constitucional a la educación bajo la Sec. 5 de la Carta de Derechos de la Constitución del Estado Libre Asociado, que dice: "Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales." [8]

----

[8] "Entre los nuevos derechos que en el siglo XX forman parte fundamental del liberalismo democrático, el de obtener educación equivale consubstancialmente a la libertad, que no es meramente la ausencia de restricciones externas sino la manifestación positiva de las potencialidades humanas. La educación es el cultivo de la personalidad para expresar de ella lo más humano en su mejor realización posible." Muñoz Amato, *El derecho a la educación y la libertad académica.* 24 Rev.C. Abo. P.R., 463 468 (1964).

Este planteamiento no puede ser despachado con el argumento de que el recurrido renunciara a ello porque no cumpliera con los plazos dispuestos en los reglamentos administrativos. Las renuncias a los derechos fundamentales no se presumen. *F.S.E.* v. *Comisión Industrial*, 105 D.P.R. 261 (1976). Estas deben ser "expresas y no presuntas, así como voluntarias y efectuadas con pleno conocimiento de causa." *Pueblo* v. *Arcelay Galán*, 102 D.P.R. 409, 415 (1974); *Pueblo* v. *Morales Romero*, 100 D.P.R. 436 (1972).

La mera invocación de un derecho constitucional frente a una actuación administrativa no es llave que automáticamente nos obligue a descartar la presunción de cosa juzgada. Precisa investigar las circunstancias de cada caso en particular. En éste se trata de un joven estudiante universitario con un alto índice académico,[9] privado por la decisión administrativa de poder continuar sus estudios en la Universidad de Puerto Rico, a base de una prueba que consideramos en *Pagán Hernández* v. *Alcaide*, supra, insuficiente, sugestiva, y poco confiable como para permitir que fuera sometido a juicio. Rehusar investigar la suficiencia de dicha prueba para justificar la suspensión permanente del recurrido como estudiante de la Universidad de Puerto Rico a base de la doctrina de cosa juzgada constituiría en este caso una autolimitación por razones técnicas, que tenemos que superar por razones de justicia.

Por último, la finalidad de la decisión administrativa en este caso es dudosa. Como correctamente concluyó el Tribunal Superior, existía confusión institucional en el ámbito administrativo con respecto a las disposiciones reglamenta-

---

[9] Surge del expediente ante nos que Pagán Hernández tenía un índice de 3.4, que de ser mantenido por él hasta su graduación, significaría que se graduaría con altos honores.

rias que proveían recursos de revisión por el Presidente de la Universidad y por el Consejo de Educación Superior. Sería absurdo exigir del recurrido obediencia estricta de un procedimiento administrativo confuso y ambiguo. ([10])

### Suficiencia de la Prueba

El tribunal a quo basó su determinación de insuficiencia de prueba en que procedía la exclusión del testimonio del teniente Atilano y, una vez excluido, no había prueba que relacionara a Humberto Pagán con los hechos que se le imputaron. El teniente Atilano señaló a Humberto Pagán como la persona que disparó un arma contra el comandante Mercado, privándole de su vida. Ya hemos señalado que en *Pagán Hernández* v. *Alcaide*, 102 D.P.R. 101 (1974), resolvimos que dicho testimonio era inadmisible para sostener una determinación de causa probable por ser insuficiente, sugestivo y poco confiable, y que el haber admitido ese testimonio violó el debido proceso de ley.

Veamos cómo se ha desarrollado la doctrina sobre debido proceso de ley en los últimos años con respecto a su aplicación a estudiantes universitarios. Como cuestión de tradición, las universidades gozaban de una gran autonomía en cuestiones pertinentes a la admisión y la disciplina de sus estudiantes. Keller & Meskill, *Students' Rights and Due Process*,

---

([10]) Para la fecha en que la Junta Disciplinaria emitió su decisión y cuando luego fue ratificada por el Lic. Cancio, el reglamento vigente que regulaba las vistas ante la Junta y ante el Lic. Cancio no contenía disposición sobre los requisitos para apelar de la decisión de la Junta o del representante del Rector. Nada decía al respecto. Tres años después de la suspensión de Pagán el Consejo de Educación Superior aprobó el Procedimiento Temporero Para Tramitar Apelaciones ante el Presidente. Aunque éste había sido adoptado por el Presidente a mediados del año académico 1966–67 y usado por él, no fue ratificado por el Consejo de Educación Superior hasta el 9 de agosto de 1974.

3 J. of Law & Educ. 389 (1974). La razón de ser de esta autonomía era que se consideraba a las universidades las expertas en su campo, por lo que no debían estar sujetas a revisión judicial. Keller & Meskill, *id.;* Rabban, *Judicial Review of the University-Student Relationship, Expulsion and Governance,* 26 Stan. L. Rev. 95 (1973). Los tribunales entendían que la relación entre el estudiante y la universidad era única y particular y que solamente la universidad contaba con la experiencia y la sensibilidad necesarias para reglamentar la admisión y las suspensiones, expulsiones y otros trámites disciplinarios de estudiantes, para así asegurar una atmósfera adecuada de enseñanza. Keller & Meskill, *supra,* págs. 389–390.

Los tribunales habían desarrollado varias teorías para definir el *status* del estudiante *vis a vis* la universidad en el Derecho. Una de éstas era la doctrina de *in loco parentis;* es decir, la universidad ocupaba el puesto de un "padre sustituto'", con la autoridad para controlar discrecionalmente al estudiante tal como si fuera su padre. Keller & Meskill, *supra,* pág. 390. Para fines del siglo XIX esta doctrina comenzó a ser desplazada por la teoría del contrato. Esta era mayormente aplicada a universidades privadas y postulaba que los reglamentos que aparecían en las publicaciones de la universidad eran las condiciones sobre las cuales descansaba el derecho del estudiante a poderse graduar. Rabban, *supra,* pág. 97. La universidad se comprometía a darle instrucción y diploma y el estudiante se comprometía a cumplir con los requisitos académicos y disciplinarios. Rabban, *supra,* pág. 97. Si el estudiante no cumplía con los reglamentos, esto equivalía a incumplimiento de su contrato y se le podía expulsar. Rabban, *supra,* pág. 97.

En cuanto a las universidades públicas, los tribunales estatales consideraban que la universidad tenía el poder discre-

cional para establecer la reglamentación que considerase necesaria. Rabban, *supra*, pág. 98. Los tribunales no intervendrían excepto en casos en que la universidad actuase en una forma irrazonable. Rabban, *supra*, pág. 98. Las cortes federales consideraban que la educación superior es un privilegio concedido por el Estado, no protegido por la Enmienda XIV. Rabban, *supra*, págs. 97–98.

El resultado práctico de estas doctrinas era que los tribunales reconocían a las universidades un poder casi absoluto y sólo intervenían si la expulsión del estudiante era arbitraria o irrazonable. Rabban, *supra*, pág. 98. No había que celebrar una vista para suspender o expulsar a un estudiante. Keller & Meskill, *supra*, pág. 391. Tal era la doctrina mayoritaria antes de la década del sesenta, hasta el caso de *Dixon* v. *Alabama State Board of Education*, 294 F.2d 150 (1961), *cert.* denegado, 368 U.S. 930 (1961). Keller & Meskill, *supra*, págs. 391–392.

En *Dixon*, un grupo de estudiantes negros fue expulsado de la Universidad del Estado de Alabama, sin notificación, ni vista, ni oportunidad de apelar. La Corte de Apelaciones federal determinó que una institución educativa mantenida por el Estado es análoga a una agencia administrativa y que, por lo tanto "cuando una entidad gubernamental actúa de tal forma que perjudica a una persona, la Constitución requiere que dicha actuación satisfaga el debido proceso de ley." 294 F.2d 150, 155 (1961), *cert.* denegado 368 U.S. 930 (1961). Esta decisión extendió a los estudiantes de universidades públicas las cláusulas del debido proceso de ley y de igual protección de las leyes contenidas en la Enmienda XIV. Determinó que el debido proceso de ley requiere notificación, con especificación de cargos, y oportunidad de vista antes de decretarse la expulsión de un estudiante por conducta indebida.

■ Aunque el caso de *Dixon* trataba la expulsión de estudiantes universitarios, las decisiones posteriores han aplicado los requisitos de notificación y vista a estudiantes de escuela superior pública que se enfrentan a una expulsión o a una suspensión. Stolz, *Due Process for Students—New Developments,* 43 Fordham L. Rev. 1011, 1012–1013 (1975). Desde el caso de *Dixon* los tribunales federales inferiores han estado exigiendo el debido proceso de ley (*procedural due process*) en casos de suspensiones y expulsiones de estudiantes universitarios y de escuela superior en instituciones públicas. Stolz, *supra,* pág. 1011. *Goss* v. *López,* 419 U.S. 565 (1975).

■ La extensión de las protecciones ofrecidas por el debido proceso de ley o *due process* procesal en los casos decididos por las cortes federales inferiores ha variado con las circunstancias de cada caso particular. Stolz, *supra,* pág. 1013 (nota al calce 19). En *Givens* v. *Poe,* 346 F.Supp. 202, 209 (1972), se ofrecieron las protecciones más amplias que hasta la fecha se habían otorgado a estudiantes, a saber, notificación de los cargos, celebración de vista, derecho a examinar las pruebas adversas y a presentar prueba favorable, derecho a contrainterrogar testigos, derecho a que se haga un récord de la vista, derecho a representación por abogado, a que se le juzgue por un tribunal imparcial, y que la decisión se base en "evidencia sustancial". Otro ejemplo de la ampliación de la protección ofrecida por el debido proceso de ley a los estudiantes en procesos disciplinarios universitarios es el caso de *De Jesús* v. *Penberthy,* 344 F.Supp. 70, 75–76 (1972), en que se desaprobó el uso de testimonio que constituía prueba de referencia o *hearsay* para fundamentar una expulsión disciplinaria porque el uso de ese testimonio violaba el debido proceso de ley ya que se expulsaba al estudiante sin darle oportunidad a confrontarse con el testigo y contrainterrogarle.

Como hemos visto, el debido proceso de ley en el sector de disciplina estudiantil no es estático ni inflexible. Ha sido objeto de ampliación si las circunstancias del caso lo ameritan. No puede afirmarse, sin embargo, que sean de aplicación a acciones administrativas disciplinarias, en términos absolutos, todos los criterios elaborados para los procedimientos criminales. No puede hacerse tal aplicación indiscriminadamente. Hay que analizar los fundamentos y los propósitos de cada norma penal que se quiera aplicar al proceso administrativo. Hay también que analizar el propósito y las consecuencias de ese proceso administrativo al cual se pueden aplicar las normas de origen penal. Sólo si los fines o fundamentos de la norma penal cumplen el mismo propósito en el proceso administrativo, si su aplicación no crea un descalabro en el orden administrativo, procede su aplicación. Veamos los siguientes casos, como ejemplos de esa aplicación de criaturas del Derecho penal al Derecho administrativo, en otras jurisdicciones.

En *Patty* v. *Board of Medical Examiners*, 508 P.2d 1121 (1973), el Tribunal Supremo de California determinó que la defensa de entrampamiento está disponible en los procedimientos administrativos en los que se ventila la revocación o la suspensión de una licencia para ejercer una profesión o un negocio, por ser tan necesaria en tales procesos como en los criminales. Además de California, un número sustancial de estados han reconocido la procedencia de la defensa de entrampamiento en procedimientos administrativos en los que está en controversia la revocación o suspensión de una licencia para ejercer una profesión, comercio o negocio. Kaufmann, *Entrapment Defense Is Available in Administrative Proceedings*, 7 Loyola of Los Angeles L. Rev. 187, 191 (1974). Véanse a tales efectos *Jones* v. *Dental Commission*, 145 A. 570, 571 (1929) (Conn.), que trataba de la revoca-

ción de una licencia de técnico dental; *Peters* v. *Brown*, 55 So.2d 334, 336 (1951) (Fla.), en que se solicitó un *injunction* para impedir que se practicara la odontología ilegalmente; *In re Davidson*, 186 P.2d 354, 357 (1947) (Nev.), un procedimiento de desaforo de un abogado; *Langdon* v. *Board of Liquor Control*, 130 N.E.2d 430, 431–432 (1954) (Ohio), en que se suspendió una licencia para vender licor; *In re Horwitz*, 196 N.E. 208, 213–214 (1935) (Ill.), un procedimiento de desaforo; *Roberts* v. *Illinois Liquor Control Commission*, 206 N.E.2d 799, 802–803 (1965) (Ill.), en que se trataba de la revocación de una licencia para la venta de licor; y *Ray* v. *Board of Liquor Control*, 154 N.E.2d 89–90 (1958) (Ohio), en que se suspendió una licencia para la venta de licor. En nuestra jurisdicción, en *In re De Castro*, 100 D.P.R. 184 (1971), aceptamos como justificación en una acción disciplinaria contra un juez a quien se le formularon cargos por agresión y por participar en una riña, que éste demostrara que actuó en defensa propia.

■ Se ha resuelto que procede excluir prueba obtenida en violación de la Cuarta Enmienda de la Constitución de los EE. UU. en acciones administrativas y civiles que comparten algunos objetivos de las acciones penales, específicamente aquellas en que una agencia del Estado se propone imponer una penalidad o una sanción, o donde se persigue revocar una licencia, o en acciones que tienen un propósito punitivo. Shazer, *Exclusionary Rules of Criminal Law Are Not Part of Administrative Due Process in State Bar Disciplinary Proceedings*, 15 Santa Clara Law., 485, 487–488 (1975). Véanse, para ejemplos: *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693 (1965), donde se confiscó un automóvil y el Tribunal Supremo federal determinó que aunque el proceso de confiscación está clasificado como una acción civil, su naturaleza es una criminal

que pretende castigar la comisión de un delito e imponer una pena, por lo cual procede excluir la prueba obtenida en violación de la Cuarta Enmienda de la Constitución; *People* v. *Reulman*, 396 P.2d 706, 709 (1964), donde el Tribunal Supremo de California decidió que la prueba obtenida en ocasión de un registro ilegal debía ser excluida en un proceso de confiscación porque éste, aunque es de naturaleza civil, tiene fines idénticos a los de los procedimientos criminales y las mismas reglas de exclusión deben aplicar cuando media conducta impropia por parte del Estado, ya se quiera privar a una persona de su libertad o de su propiedad; *People* v. *Moore*, 446 P.2d 800 (1968), en que se determinó en un procedimiento para internar a un adicto en una institución para su tratamiento—procedimiento de naturaleza civil—que prueba ilegalmente obtenida era inadmisible toda vez que el alcance del procedimiento implicaba para el demandado la privación de su libertad; *Elder* v. *Board of Medical Examiners*, 50 Cal. Reptr. 304, 315 (1966), *cert.* denegado 385 U.S. 1001 (1966), donde la Corte de Apelaciones de California asumió que la regla de exclusión de prueba basada en la Cuarta Enmienda de la Constitución federal aplicaba a procedimientos seguidos ante la Junta de Examinadores Médicos cuyo propósito era privar a un médico de su licencia; *Knoll Associates, Inc.* v. *F.T.C.*, 397 F.2d 530 (1968), donde se excluyen unos documentos como prueba en una acción contra una corporación ante la *Federal Trade Commission* porque éstos habían sido hurtados con el propósito de presentarlos como prueba y ello violaba la Cuarta Enmienda; *Rogers* v. *United States*, 97 F.2d 691 (1938), una acción civil por parte del Tesoro de los E.E. U.U. para recuperar arbitrios por licor importado; *Lassoff* v. *Gray*, 207 F.Supp. 843 (1962), una acción civil del contribuyente para recobrar impuestos; *Carlisle* v. *State*, 163 So.2d 596 (1964) (Ala.), donde el Estado soli-

citó un *injunction* para impedir que el demandado mantuviera juegos de azar en su establecimiento; y *Finn's Liquor Shop, Inc.* v. *State Liquor Authority*, 294 N.Y.S.2d 592 (1968), en que se trataba de la suspensión de una licencia de vender licor.

Por último, en el caso de *Smyth* v. *Lubbers*, 398 F.Supp. 777 (1975), varios funcionarios universitarios registraron los dormitorios de varios estudiantes sin órdenes de registro y allanamiento. Descubrieron marihuana y luego de los procedimientos administrativos disciplinarios, dos de los estudiantes fueron suspendidos por poseer marihuana. El Tribunal de Distrito federal determinó que la marihuana ocupada era inadmisible en el procedimiento disciplinario porque ésta se había obtenido en un registro ilegal. Aplicaba en este caso la Cuarta Enmienda porque la marihuana se descubrió en el registro del cuarto de un estudiante específico del cual se sospechaba que estaba incurriendo en actividad ilegal. Como ese estudiante estaba en la misma posición que un sospechoso de un delito, procedía obtener una orden de allanamiento y de registro antes de registrar su cuarto. Siendo ilegal el registro era inadmisible la prueba ocupada.

En el caso de autos, la única prueba que relaciona al recurrido con los sucesos ocurridos en la Universidad y que da base a la decisión administrativa es el testimonio del teniente Atilano de la Policía de Puerto Rico. Ese testimonio fue el mismo que consideramos en *Pagán Hernández* v. *Alcaide*, supra, y que allí resumimos de la siguiente manera (págs. 106–107):

"Con motivo de una violenta protesta estudiantil en el recinto de la Universidad de Puerto Rico, se solicitó intervención de la policía estatal. Acudieron a la llamada 42 agentes de la unidad de reserva especializada—fuerza de choque—bajo el mando del Comandante Mercado. Al llegar encontraron una muchedumbre de personas amotinadas atacando el edificio donde estaba ubicado

el R.O.T.C. y por los alrededores del edificio conocido como Centro Universitario.

Al terminar los sucesos, seis policías resultaron heridos de bala. El Comandante Mercado fue muerto de un balazo. El segundo en comando, Teniente Atilano, identificó a Humberto Pagán como la persona responsable de haber disparado el arma homicida. Declaró que estando a una distancia aproximada de cincuenta pasos del monumento a Miguel de Unamuno, un sargento le informó que estaban disparando y lo habían alcanzado en el tobillo. En ese mismo instante se percata de que Mercado, a diez pasos de él, y a cuarenta del monumento, se está tambaleando. Instintivamente mira hacia el monumento y observa a una persona disparando en dirección hacia Mercado. Al describir a dicha persona se limita a expresar que era 'un individuo de unos cinco pies y nueve pulgadas más o menos, blanco él, de patillas.' Declara asimismo que en ese momento escuchó varias detonaciones, provenientes 'de los árboles así del frente y al mismo tiempo del monumento.' Utiliza la palabra 'balacera' para describir la situación que presenció. El testigo comenzó a acercarse al monumento pero la persona que había visto disparando retrocedió y se mezcló en la multitud. Sólo lo pudo observar ese instante a una distancia de treinta y cinco pasos (70) pies. Bajo estas circunstancias, observando a 75 pies del monumento, en momentos de tensión, nerviosismo y honda preocupación se hace difícil si no imposible, reconocer a una persona y surgen serias dudas sobre la confiabilidad de la identificación. Y ya hemos visto que al describirlo da muy pocos detalles. No hay otra evidencia que sitúe al peticionario en los alrededores del sitio donde ocurrieron los hechos."

Al día siguiente, y con motivo de una confidencia que obtuvo la Policía, el teniente Atilano, en el cuartel del C.I.C., identificó al recurrido de entre determinado número de tarjetas de estudiantes universitarios que contenían, además de fotografías, el nombre y otros datos personales de cada estudiante.

■ Dado el poco tiempo que pudo observar a Humberto Pagán el teniente Atilano, las circunstancias bajo las cuales

lo observó—un desorden estudiantil, un encuentro entre la policía y los manifestantes, la persona identificada estaba parcialmente escondida detrás del monumento, los separaba una distancia considerable, y sólo lo pudo ver una fracción de segundos en medio de una balacera—el testimonio del teniente Atilano y su identificación del recurrido por las fotografías no es confiable, se obtuvo en violación del debido proceso de ley a los fines de la acción criminal y era inadmisible. *Pagán Hernández* v. *Alcaide*, supra. Esas mismas razones obligan a la exclusión de ese testimonio en el procedimiento administrativo que ahora examinamos. Dichos criterios son aquí aplicables toda vez que el procedimiento disciplinario universitario perseguía un propósito punitivo mediante el cual se privó al recurrido de su derecho constitucional a la educación. Al igual que el tribunal a quo, no creemos necesario enunciar en este caso las normas guías para identificación en casos de disciplina estudiantil universitaria. Sencillamente rechazamos el procedimiento seguido en el caso de autos por hallarse desnudo de garantías constitucionales. Consideramos, por tanto, que no se cometió el primer error.

El resultado al cual llegamos no contradice los casos de *Mundo* v. *Tribunal Superior*, 101 D.P.R. 302 (1973) ; *In re De Castro*, 100 D.P.R. 184 (1971) ; *Vélez Quiñones* v. *Srio. de Instrucción*, 86 D.P.R. 755 (1962) ; y *Cruz* v. *Garrido Morales*, 58 D.P.R. 653 (1941). En todos estos casos, las personas sometidas al proceso disciplinario administrativo plantearon como defensa que habían sido absueltas por los tribunales en los procesos penales instituidos en su contra por los mismos hechos que provocaron los procesos administrativos. En otras palabras, se planteó que el hecho de que ya se hubiera juzgado y absuelto a una persona en un caso penal impedía la formulación de cargos administrativos en su contra y el consecuente

proceso disciplinario administrativo. Rechazamos tal contención, y ahora la ratificamos. La absolución penal no confiere inmunidad en el campo administrativo.

 El caso de autos, por su parte, no plantea un reclamo de inmunidad a base de una previa absolución criminal, sino un ataque constitucional a la prueba de identificación que tuvo ante sí la agencia administrativa. Es de notarse, además, que Pagán Hernández no fue juzgado y absuelto por un tribunal por los cargos criminales que se le imputaron. Sabido es que en un caso criminal la culpabilidad tiene que probarse más allá de duda razonable, norma que no ha sido impuesta para las acciones administrativas. Lo que resolvimos en *Pagán Hernández* v. *Alcaide*, fue que no había causa probable para someter a juicio al recurrido. Si la prueba era insuficiente para tal fin, no puede justificarse que fuera suficiente para sostener un dictamen de expulsión permanente de la Universidad, privándole de su derecho constitucional a obtener una educación universitaria en la Universidad del Estado.

*La sentencia del Tribunal Superior será confirmada.*

El Juez Asociado Señor Rigau disintió con opinión separada. El Juez Asociado Señor Díaz Cruz disintió con opinión a la cual se une el Juez Asociado Señor Angel M. Martín.

—O—

Opinión disidente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 16 de octubre de 1978

Me veo obligado a disentir y creo que debo explicar. Aunque lo haré en la forma más breve posible, consistente con una

razonable claridad. (¹) Al disentir lo hago, claro está, con el mayor respeto para el criterio mayoritario y reconociendo las dotes de buena intención y honradez intelectual que caracterizan al distinguido y muy capacitado compañero Juez ponente.

# I

En la causa penal sobre asesinato seguida contra el aquí recurrido éste venció pues el Tribunal resolvió que la admisión en evidencia de la identificación que de él se hizo violó el debido procedimiento de ley. En este recurso se plantea una situación distinta.

No creo que aquí se trata de meramente si Humberto Pagán debe ser restituido o no al cuerpo de estudiantes de la Universidad de Puerto Rico. Si de eso solamente se tratase yo no molestaría la ocupada atención de ustedes con este disenso. Porque creo que se trata de mucho más es que lo hago. Se trata, estimo, de cuál es la calidad que debe tener la vida universitaria y de qué criterios deben gobernarla.

¿Debemos concebir el *campus* universitario como lugar especialmente consagrado por la sociedad (a un costo de cientos de millones de dólares anuales para nuestra estrecha economía) para que sirva de residencia a la casa de estudios, donde deben prevalecer la mayor libertad de conciencia, de investigación científica y de estudio, pero no la ley del revólver, o acaso debemos concebirlo como un microcosmo de la pecaminosa metrópolis donde la inseguridad personal es la nota predominante y donde la agresión y el crimen se han vuelto parte tan importante del panorama que la arquitectura moderna no

---

(¹)Participo en mucho del criterio de Gracián de que si un escrito es malo pero es breve, es menos malo; y si es bueno y breve, es dos veces bueno. Tratándose de opiniones judiciales—literatura inherentemente pesada y de lectura forzosa para jueces, abogados, profesores y estudiantes de Derecho—el concepto gracianiano no puede ser más apropiado.

sólo tiene que prever contra las inclemencias del tiempo sino también contra el asalto a los hogares de día y de noche? (²)

No hagamos de la Universidad una copia de esa mala vida urbana, que tan poco tiene de urbanidad. Recuérdese que cuando se rompió la unidad europea, a comienzos de la Edad Media, y mientras los nobles, sedientos de poder y convertidos en jefes guerreros, asolaban los campos y quemaban los pueblos haciéndose la guerra unos a los otros, fue en los monasterios y en los estudios de los sabios en donde se salvó la semilla de la cultura que luego floreció esplendorosamente con el renacimiento. La Universidad contemporánea es la heredera de esa misión.

## II

La opinión mayoritaria es un documento muy bien trabajado e informativo pero no creo que guarda la estrecha relación que debiera con nuestras realidades. Además, su tamaño masivo y su casi centenar de citas hace pensar al lector experimentado en estas materias que en el fondo algo late vivo a pesar de toda esa masa inerte con que se ha cubierto. Y es que en las funciones del intelecto y del espíritu, como la de juzgar, la cantidad tiene muy poca relevancia pues se trata de conciencia.

Todas esas citas no deben impresionarnos mucho, especialmente los casos, pues son éstos anécdotas jurídicas que no resuelven la situación de autos. Por ejemplo, el caso tal vez más parecido a éste que allí se cita es el de *Dixon*, 294 F.2d 150 (1961), pues trata de un grupo de estudiantes de un grupo minoritario que fue expulsado de la Universidad del Esta⸀

---

(²) Rejas, ascensores con llave, alarmas eléctricas, sistemas de ᐟ comunicación entre el piso y la entrada del edificio, guardias privad᠂ ːuitos cerrados de televisión, etc.

de Alabama, sin notificación previa, sin vista, y sin oportunidad de apelar. Ese no fue el procedimiento que aquí se utilizó. Además, lo realmente importante para distinguir ambos casos es el subsuelo de los mismos. Son notorias las relaciones interraciales que se daban en el pasado en los estados del sur de Estados Unidos. Ante aquella serie de atropellos, cometidos con frecuencia por policías y alguaciles blancos, municipales y estatales, los tribunales federales se fueron al otro extremo para proteger a los desvalidos que necesitaban protección urgentemente. Esa situación histórica tampoco se ha dado en Puerto Rico. Sin embargo, la situación histórica que produce los hechos de este caso sí es nuestra, a diferencia de la de Alabama.

Dicho sea excluyendo al que escribe, al jurista ubicado en un Tribunal Supremo que maneja el Derecho con seguridad, los casos le ilustran pero no le gobiernan. Es sabido que uno de los espíritus más sensitivos y cultivados que ha honrado la judicatura norteamericana, el Juez Oliver Wendell Holmes, Jr., consideraba los casos como *el menudo* del Derecho. *"Small change,"* los llamó.—*Collected Legal Papers* (1920), pág. 300. No es mejor la opinión que de los mismos tenía el distinguido Profesor John Wigmore. Véase la severa y específica crítica que hace del derecho casuístico en su obra Wigmore, *On Evidence*, 3ra ed., sec. 8a (I) (A), 1940.

La biblioteca de este Tribunal pasa de los 60,000 volúmenes. No tengo duda de que pueden extractarse de ellos miles de citas que sirvan para argumentar que la opinión mayoritaria es la correcta o que lo es mi posición. Tampoco tengo duda de que hacerlo sería fútil.

Como indicamos antes, aquí se trata, en parte, de si la Universidad podía y puede suspender o expulsar a Pagán como estudiante. La prueba no desvirtuada demostró que el recurrido tenía, el día de los hechos, una pistola en la mano

mientras se encontraba, en su calidad de estudiante, participando en un motín, en el *campus* universitario.

La opinión mayoritaria le niega el derecho a la Universidad de expulsarlo por esa razón, lo cual equivale a darles a los estudiantes universitarios el derecho a estar y caminar en el *campus* con armas de fuego en la mano. Eso permitiría un desastroso deterioro en la vida pacífica de cualquier comunidad y en especial en la comunidad universitaria. Crearía un clima de terror en dicho *campus* y pondría en gran riesgo la seguridad y las vidas de profesores y estudiantes. Las armas de fuego, ilegalmente portadas o utilizadas, constituyen precisamente la negación de lo que debe ser el estilo de vida universitario. La Universidad no debe ser gobernada ni por el terror de la política ni por la política del terror.

La Universidad es la casa de estudios por excelencia y allí los valores primarios deben ser la calidad moral y la competencia intelectual. La Universidad necesita un clima de paz y debe allí haber gran tolerancia para las ideas más dispares pero no para la violencia. La violencia es destructiva de la vida universitaria. Para que esa vida subsista en una medida razonable es de esperarse que los estudiantes en el *campus* porten libros pero no armas de fuego.

Como éste es un caso muy distinto a la causa criminal anteriormente mencionada y como los valores envueltos son en gran medida también diferentes, pero no menos indispensables para la existencia y el éxito de la vida universitaria, entiendo que la Universidad tenía y tiene el poder de expulsión que ejerció. En la causa criminal antes aludida, *Pagán Hernández* v. *Alcaide*, 102 D.P.R. 101 (1974), el Tribunal reconoció hasta el máximo los derechos posibles y teóricos del aquí recurrido. En esta ocasión lo menos que podemos reconocerle a la Universidad es su elemental y básico derecho a su vida.

A su vida como institución libre, desinteresada de todo egoísmo pero interesada en crear y estimular en sus profesores y estudiantes las actitudes de la tolerancia intelectual y de la incesante búsqueda de la verdad y de su enseñanza. Puerto Rico necesita aumentar rápidamente su completivo de estudiosos y sabios y disminuir su pesado fardo de perturbadores de la paz universitaria. Estos se hacen de la noche a la mañana, pero para educar a un sabio se necesitan 60 ó 70 años. Por eso hay que comenzar inmediatamente esta tarea.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz a la que se une el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 16 de octubre de 1978

I

La opinión de mayoría invoca para el recurrido, expulsado por graves cargos de la Universidad de Puerto Rico, consideraciones de orden público que excepcionalmente excluyen el impedimento de cosa juzgada y al así razonar, equipara la posición del recurrido a la de un menor de edad que busca su filiación(1) descuidada por su señora madre y sus abogados. Aquel caso se resolvió en favor del menor para evitar la derrota de la justicia en un asunto saturado de "interés público". Su doctrina se vuelve contra la opinión que la cita, toda vez que separado un estudiante adulto de la Universidad del Estado, seguido el debido proceso de ley de audiencia plena en la cual resultaron probadas gravísimas faltas contra el

---

(1)*Pérez* v. *Bauzá*, 83 D.P.R. 220 (1961).

orden y la paz del recinto académico, es patente que los valores de justicia y de "interés público" a proteger no son los del expulsado, sino los de miles de estudiantes y profesores que integran la comunidad académica, y la justa esperanza de este pueblo en su progreso y bienestar fomentado por la educación avanzada de sus hijos. La desorbitada exaltación de los derechos individuales de un infractor del orden académico juzgado y sancionado, es incomprensible menosprecio del derecho de nuestra Universidad a subsistir.

El recurrido tuvo una generosa y hasta paternalista oportunidad de rebatir los cargos ante los organismos administrativos de la Universidad, que declinó sin explicación alguna. No se justifica intervenir con la finalidad y la integridad del proceso administrativo, afirmada por este Tribunal mucho antes que *United States* v. *Utah Constr. & Min. Co.*,[2] 384 U.S. 394, 421 (1966), en *Sierra, Com.* v. *South P.R. Sugar Co.*, 73 D.P.R. 157, 164 (1952), y en *Caguas Bus Line* v. *Sierra, Com.*, 73 D.P.R. 743, 748 (1952), donde por voz del Juez Snyder sostuvimos que firme la decisión administrativa, una parte no puede atacarla colateralmente[3] en otro pro-

---

[2] El texto del Supremo federal es iluminante:

". . . estamos conscientes de que el resultado que hemos obtenido guarda armonía con los principios generales de impedimento (*estoppel*) colateral. En ocasiones los tribunales han usado lenguaje indicativo de que los principios de cosa juzgada no se aplican a procedimientos administrativos, pero tal lenguaje es ciertamente demasiado amplio (*broad*). Cuando una agencia administrativa actúa en su capacidad judicial y resuelve controversias de hecho propiamente sometidas a ella que las partes han tenido adecuada oportunidad de litigar, los tribunales no han vacilado en aplicar la cosa juzgada para imponer reposo. [Citas] . . . . no hay necesidad ni justificación para una segunda vista evidenciaria sobre hechos ya adjudicados entre las partes." *United States* v. *Utah Constr. & Min. Co.*, supra, a la pág. 421.

[3] No están disponibles remedios colaterales. *Asoc. de Distribuidores* v. *Admón. Estabilización*, 81 D.P.R. 212 (1959); *Concepción* v. *Junta de Contabilidad*, 80 D.P.R. 194 (1958); *Sierra, Com.* v. *Llamas*, 73 D.P.R. 908 (1952). Este Tribunal ha resuelto que carece de jurisdicción aun para

cedimiento levantando nuevas cuestiones, incluyendo cuestiones constitucionales, que pudo suscitar, pero no suscitó en el procedimiento original. No veo razón para abandonar nuestra jurisprudencia, bien fundada como está en el principio que acogió el Tribunal Supremo de los Estados Unidos en *Utah Constr. & Min. Co.*, supra, por decisiones de tribunales inferiores citadas en la ponencia. El válido proceso administrativo seguido por la Universidad contra el recurrido tiene la dignidad y eficacia de cosa juzgada, oponible a la acción civil objeto del presente recurso.

## II

El tardío ataque a la prueba de identificación del recurrido en el proceso administrativo, no plantea cuestión constitucional. Aparte de que los fundamentos de decisión de la mayoría en *Pagán Hernández* v. *Alcaide*, 102 D.P.R. 101 (1974), han sido descartados en subsiguiente doctrina de este Tribunal sobre identificación criminal en *Pueblo* v. *Suárez Sánchez*, 103 D.P.R. 19 (1975) (en reconsideración) y *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978), el propio juez ponente a la postre reconoce la independencia y separación entre los procesos criminales y administrativos al extremo de que ni aun el eximio contenido de justicia en un veredicto absolutorio impide la sanción administrativa. *Cruz* v. *Garrido Morales*, 58 D.P.R. 653 (1941); *In re De Castro*, 100 D.P.R. 184, 187 (1971); *Mundo* v. *Tribunal Superior*, 101 D.P.R. 302, 304 (1973); *Vélez Quiñones* v. *Srio. de Instrucción*, 86 D.P.R. 755, 758 (1962).

---

revisar la decisión administrativa, si no se cumple con el procedimiento. *Sucn. García* v. *Junta Planificación*, 70 D.P.R. 726 (1949); *Mari* v. *Junta Planificación*, 66 D.P.R. 371 (1946); *Rodríguez* v. *Comisión Industrial*, 61 D.P.R. 222 (1942).

Por los expresados fundamentos estimo que la sentencia recurrida debe ser revocada.