

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Universidad de Puerto Rico<br><br>    Peticionarios<br><br>             v.<br><br>Gabriel Laborde Torres y otros<br><br>    Recurridos | Certiorari<br><br>2010 TSPR 234<br><br>180 DPR \_\_\_\_ |

Número del Caso: CT-2010-8

Fecha: 28 de diciembre de 2010

Abogados de la Parte Peticionaria:

        Lcdo. Raúl M. Arias Marxuach
        Lcda. Maralyssa Álvarez Sánchez

Abogados de la Parte Recurrida:

        Lcdo. Alex O. Rosa Ambert
        Lcdo. Luis José Torres Asencio
        Lcdo. José J. Nazario de la Rosa
        Lcdo. Juan Santiago Nieves
        Lcdo. Manuel A. Rodríguez Banchs
        Lcdo. César A. Rosado Ramos
        Lcdo. Hans S. Perl Matanzo
        Lcdo. Carlos Cotto Cartagena
        Lcdo. Enrique G. Juliá Ramos
        Lcdo. Edgardo L. Rivera Rivera
        Lcdo. Harry Anduze Montaño
        Lcdo. Frank Torres Viada
        Lcdo. Gaspar Martínez Mangual

Materia: Certificación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Universidad de Puerto Rico
        Peticionarios

            v.
                                    CT-2010-0008
Gabriel Laborde Torres y otros
        Recurridos

Voto particular emitido por el Juez Asociado Señor Rivera García al que se unen el Juez Asociado señor Martínez Torres, la Jueza Asociada, señora Pabón Charneco, y el Juez Asociado, señor Kolthoff Caraballo.

En San Juan, Puerto Rico, a 28 de diciembre de 2010.

"I, of course, do not mean to say or even to intimate that freedom of speech, press, assembly, or petition can be abridged so long as the First Amendment remains unchanged in our Constitution. But to say that the First Amendment grants those broad rights free from any exercise of governmental power... would subject all the people of the Nation to the uncontrollable whim and arrogance of speakers, and writers, and protestors, and grievance bearers.

. . .

Were the authority of government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past".[1]

–JUSTICE HUGO BLACK, UNITED STATES SUPREME COURT–

---

[1] Gregory v. City of Chicago, 394 U.S. 111, 124-125 (1969) (Opinión concurrente).

I

Nuestra Ley Suprema proclama con palmaria claridad **que "el sistema democrático es fundamental para la vida de la comunidad puertorriqueña"**. Véase Preámbulo, Const. E.L.A., L.P.R.A., Tomo 1. ed. 2008, pág. 266. Como derivación lógica de tal sistema democrático, resulta forzosa la existencia de una Constitución. Véase C.J. Friedrich, La democracia como forma política y como forma de vida, 2nda ed., Tecnos, S.A., Madrid, 1966, pág. 14. En ella, todo funcionario público –incluyendo el Juez– encuentra su fuente de poder –al igual que los límites a éste–, *y se garantizan las libertades fundamentales del ciudadano*, incluso las indemnidades de aquellos que se encuentran en la minoría. Íd.

Es a la luz de esta realidad social que esta Curia ha articulado que

> [s]e incluyen en la constitución de un país aquellos principios jurídicos a los cuales desea imprimírseles estabilidad. *Se trata de aquellas normas sociales que se consideran vitales para la convivencia pacífica, el bien común y la continuidad de una democracia saludable.* En suma, son reglas de carácter tan esencial para una sociedad, que su permanencia no se abandona a los vaivenes de gobierno o a meros cambios de idiosincrasia. (Énfasis nuestro). Colón Cortés v. Pesquera, 150 D.P.R. 724, 766 (2000).

Sin lugar a dudas, la garantía cardinal de la libertad de expresión consagrada en nuestra Carta de Derechos integra esa lista de principios jurídicos a los cuales los padres de nuestra Constitución quisieron imprimirles estabilidad por considerarlos de importancia

vital para nuestra vida democrática.  Véase Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1. ed. 2008, pág. 285. No obstante, aunque el derecho a la libertad de palabra goza de primacía entre las garantías esenciales de nuestro ordenamiento constitucional (Asoc. De Maestros v. Srio. De Educación, 156 D.P.R. 754, 767 (2002)), su alcance y ámbito de aplicabilidad nunca ha sido irrestricto o absoluto (Ashcroft v. ACLU, 535 U.S. 564, 573 (2002)).

Como bien ha señalado el Tribunal Supremo federal, para que todo ciudadano de nuestra sociedad democrática goce de la libertad trascendental de poder asociarse y manifestar su pensamiento y mensaje, es imperativo que tal garantía primordial encuentre su desarrollo dentro de los contornos filosóficos de una sociedad de ley y orden.  Así lo concibió el más alto foro federal al articular lo siguiente:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. *The constitutional guarantee of liberty implies the existence of an organized society maintaining order, without which liberty itself would be lost in the excesses of anarchy*". (Énfasis nuestro). Cox v. State of La., 379 U.S. 536, 554 (1965).

La opinión disidente de mi estimada y distinguida compañera Fiol Matta parece obviar tal notoria realidad. Es por ello que a continuación expreso mis preocupaciones fundamentales relativas a las implicaciones prácticas que su ponencia podría tener sobre nuestra sociedad democrática de ley y orden.  Concretamente, examinaré dos

elementos básicos de su opinión, a saber: (1) la utilización de un discurso que no le reconoce frontera o límite alguno al derecho a la libertad de expresión de los estudiantes, el cual tácitamente legitima los actos violentos de un grupo minoritario de estudiantes universitarios so pretexto de éstos ejercer una manifestación que materialice "el descontento social" que experimentan por motivo de "las tensiones provenientes del contexto económico-social del país";[2] y (2) la confusión de la misión principal de la Universidad -ser una casa de estudio- con una de las muchas misiones accesorias de ésta -proveer espacios de participación estudiantil que propendan al desarrollo de la personalidad moral del estudiantado- justificando así que, en aras de alcanzar las misiones accesorias de la Universidad, se perjudique la obtención del objetivo principal de ésta. Veamos.

II

A. *Un reconocimiento irrestricto del derecho a la libertad de expresión que avala tácitamente la violencia de un grupo reducido de estudiantes y destruye los derechos de aquellos que desean estudiar.*

La ponencia disidente articula que, "si bien es cierto que la Opinión mayoritaria parece reconocer en algunas oraciones el derecho a la libertad de expresión del estudiantado, sus palabras son negadas por su razonamiento y conclusiones ... [abriendo] las puertas a

---

[2] Opinión Disidente de la Señora Jueza, Fiol Matta, pág. 16.

que se vulneren derechos constitucionales fundamentales de los estudiantes de nuestro primer centro docente". Opinión Disidente de la Señora Jueza, Fiol Matta, pág. 2. Entre algunos de los fundamentos que utiliza para sostener su conclusión, la compañera Jueza Asociada expresa lo siguiente:

> no coincidimos con las expresiones de la mayoría sobre el efecto negativo de las manifestaciones estudiantiles. Para la mayoría, las protestas universitarias crean polémicas entre los estamentos de nuestro primer centro docente y generan gran tensión en Puerto Rico. Este análisis evade la posibilidad de que las manifestaciones, en vez de causar desosiego, sean resultado del descontento social producido. Más importante aún, ignora la naturaleza de la Universidad como centro de intercambio de ideas que, por su propia función, fomenta relaciones dinámicas entre sus miembros que muchas veces trascienden lo verbal e incluso el plano físico de nuestro primer centro docente. Ello es testamento a la Universidad como 'centro de ebullición, de irradiación de valores y de circulación de reclamos cruciales en nuestra vida de pueblo'. Por tanto, decir que los actos de expresión estudiantil desencadenan *sui generis* el malestar general de nuestro Pueblo es irresponsable y desacertado.[3]  (Citaciones internas omitidas) Íd., pág. 17.

---

[3] Además, la Opinión Disidente enuncia que el injunction permanente que en su día podría emitir el Tribunal de Primera Instancia según los postulados de la Regla 57.5 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V, R. 57.5), y conforme a lo establecido en la Opinión Mayoritaria circulada el 13 de diciembre de 2010, es muy amplio en su ámbito de aplicación, englobando bajo su mandato a toda una comunidad de estudiantes universitarios que no forman parte del presente pleito. **Debido a que la Opinión mayoritaria se limitó a los hechos alegados en el caso que nos ocupa y a las partes emplazadas, no vemos necesidad alguna de divagar en ejercicios especulativos sobre la aplicabilidad o no de un injunction a terceros. El uso del término *estudiantes* en la Opinión mayoritaria se limitó a la exposición del derecho aplicable que servirá de guía al Tribunal de Primera Instancia una vez se remita el caso a éste para su debida atención. Tal exposición del derecho puede utilizar términos inclusivos como lo es la palabra *estudiantes,* toda vez que la norma jurídica enunciada constituye el precedente judicial aplicable a casos de esta naturaleza.**

Las antedichas declaraciones representan una peligrosa proposición por varias razones que abordamos a continuación. Primero, la opinión disidente –mediante un discurso que no le reconoce límites a la garantía constitucional a la libertad de expresión– coarta y atropella los derechos de los estudiantes no-manifestantes de poder recibir una educación de excelencia, prefiriendo que la toma –violenta o no– de un recinto por un grupo minoritario de estudiantes impida que la Universidad de Puerto Rico cumpla su cometido pedagógico por espacio de 62 días consecutivos. Al concebir que los estudiantes –sean aquellos emplazados en el caso que nos ocupa u otros– pueden "impedir el paso a los espacios universitarios, aunque sea de forma no violenta y persuasiva" (modalidad de cierre-de-portones que se nos hace difícil concebir), la ponencia disidente avala tácitamente, como medio de expresión, actos que van en detrimento de los derechos de otros estudiantes. Íd., págs. 4-5.

A la mente racional le es fácil deducir que el acto de imposibilitar el acceso a un recinto universitario, sea de forma "pacífica" o no, siempre representará un acto de violencia. Por tal motivo, resulta contradictorio que la ponencia disidente haga la salvedad que la misma se limita sólo a expresiones y manifestaciones pacíficas, sin endosar "los actos violentos que puedan llevar a cabo ciertos individuos, estudiantes u otros", cuando el negarle a los estudiantes no-manifestantes la entrada a la

Universidad se justifique por un reconocimiento irrestricto del derecho a la libre expresión de ciertos estudiantes. Íd., pág. 5, esc. 5.

Segundo, la opinión disidente justifica el coartar los derechos de los estudiantes que desean estudiar aseverando que las manifestaciones estudiantiles de una minoría (consistentes en impedir el acceso a la Universidad y tomar control de la misma) nacen del "descontento social" que éstos experimentan, al igual que la concepción que ostentan en torno a la Universidad como un centro "que faculta el intercambio de ideas y que fomenta relaciones dinámicas entre sus miembros". Sin embargo, somos del criterio que el alegado descontento social que pueda experimentar determinado grupo de nuestra comunidad no puede ser excusa para el uso irracional de la fuerza o la violencia; o incluso, el uso de manifestaciones que vayan en detrimento de los derechos de los demás. En una sociedad democrática de ley y orden, existen diversos medios apropiados para ventilar las frustraciones que un estudiante puede sentir ante el contexto socio-económico que afrenta. Así lo reconoce la opinión mayoritaria al disponer que

> los estudiantes deben poder valerse de múltiples vías alternas de comunicación, a saber: manifestaciones, marchas, pancartas, expresiones simbólicas y el uso de la tecnología, entre otros medios legítimos, *siempre y cuando sus actos no interrumpan el flujo normal de las clases ni atentan contra los derechos de otros individuos dentro de la comunidad universitaria.* Universidad de Puerto Rico v. Gabriel Laborde y

otros, 2010 T.S.P.R. 225, a la pág. 55, 180 D.P.R. ___.

Lo anterior reconoce expresamente un derecho de los estudiantes a manifestarse en el campus universitario –según lo exige el derecho constitucional a la libertad de expresión– pero limita tal derecho a que se garantice el flujo normal de las clases y se protejan los derechos de otros miembros de la comunidad universitaria.

Igualmente, recurrir al cierre de una Universidad fundamentándose en que así se atiende el descontento social que, desde la perspectiva de un sector estudiantil, les ha tocado vivir, resulta contradictorio, falto de un juicio sereno, sensato y desprovisto de una conciencia clara del daño que dichas actuaciones le infligen al primer centro docente de nuestro país. Más aún, distinto al criterio que ostenta la opinión disidente, no concibo el pensamiento de que una Universidad cerrada faculta "el intercambio de ideas [entre la comunidad universitaria] y [fomenta] relaciones dinámicas entre sus miembros". Me pregunto, ¿dónde se hará este intercambio o flujo de ideas? ¿Cuál será el 'punto medio' que saciará las inquietudes estudiantiles? ¿Acaso tal 'punto medio' se define por la condescendencia total de la administración universitaria a todo reclamo estudiantil? ¿Acaso el cierre de portones y la toma de la Universidad por la fuerza propicia "la discusión y el diálogo" de forma más eficiente? Claramente, la respuesta a estas interrogantes

es en la negativa.  Aún así, la opinión disidente parece sugerir lo contrario.

Soy del criterio que una Universidad cerrada, bajo el pretexto de constituir una manifestación del derecho constitucional de los estudiantes a la libertad de expresión, simplemente no puede tolerarse.  Ello representa una carga demasiado onerosa para nuestro pueblo y su sistema democrático.

Tercero, la ponencia disidente de nuestra compañera Jueza Asociada omite ejercer un *balance de intereses* justo entre los derechos de libertad de expresión de los estudiantes y el interés de la administración universitaria por instaurar un ambiente académico que cumpla con el fin educativo de la institución universitaria de forma ordenada y disciplinada, a la vez que se protejan los derechos a estudiar de los estudiantes que así deseen hacerlo.

En materia de *libertad de palabra* el balance *de los intereses* en pugna es de naturaleza crucial.  Dodd v. Rambis, 535 F. Supp. 23, 27 (dic. 7, 1981, S. Dist. Indiana) ("Freedom of expression demands breathing room. However, there are limits-no freedom is absolute.  To allow such would violate the rights of others.  In most instances *it is the duty of the court to view the balance of interest-freedom of expression vs. individual rights-and to weigh the detrimental effect on each.*").  Al analizar la pugna de intereses en el contexto

universitario, esta Curia ha detallado con precisión el ejercicio de balance de intereses que los jueces estamos llamados a efectuar entre las prerrogativas constitucionales de los estudiantes y la encomienda de la administración universitaria de asegurar un ambiente adecuado de enseñanza. Así, en <u>Sánchez Carambot v. Dir. Col Univ. Humacao</u>, 113 D.P.R. 153, 162 (1982), declaramos que

> ... es afín con la esencia vital de la universidad la norma constitucional que reconocimos en <u>Rodríguez v. Srio. de Instrucción</u>, [109 D.P.R. 215 (1979)], a los efectos de que estudiantes y profesores conservan sus derechos de expresión y asociación pacífica *en consonancia con los propósitos de la institución, cuando entran a los centros de enseñanza.* (Énfasis nuestro). 113 D.P.R. 153, 162 (1983).

A la luz de estas declaraciones, la opinión mayoritaria ejerció un *balance de intereses* concienzudo. Como resultado, reconoció que "el derecho a la libertad de expresión de estudiantes, empleados y profesores debía ser cónsono con la misión educativa de la universidad", advirtiéndole a la administración universitaria que no tenía "un poder irrestricto para limitar el derecho a la libertad de palabra so pretexto de alcanzar sus objetivos pedagógicos". <u>Universidad de Puerto Rico v. Gabriel Laborde y otros</u>, supra, pág. 46. Igualmente, le requirió a la administración universitaria que mostrara "los hechos que razonablemente la han llevado a concluir que de permitir [determinada] actividad proscrita, se alterarían substancialmente o se causaría una seria intervención con

las actividades docentes". (Citaciones internas omitidas). Íd. Sólo así podemos alcanzar un balance adecuado entre los intereses en pugna, logrando un resultado ecuánime y justo para todas las partes involucradas en el pleito.

No obstante, al examinar la opinión disidente de mi compañera, la Jueza Asociada, señora Fiol Matta, no encuentro mención alguna de los intereses de los estudiantes no-manifestantes y su derecho a estudiar conforme a su voluntad. Igualmente, no se menciona la necesidad de reconocerle a la administración universitaria una deferencia adecuada al momento de procurar –mediante sus prácticas y políticas– el orden y la civilidad en el recinto universitario, al igual que la integridad institucional del primer centro docente del país. Por último, se omite expresión alguna sobre el derecho del pueblo puertorriqueño a tener acceso al cúmulo de recursos que provee la Universidad de Puerto Rico para el disfrute de todos. La ponencia disidente inclina la balanza de manera irrestricta a favor del derecho a la libertad de expresión de los estudiantes y olvida que en nuestro ordenamiento legal tal derecho coexiste con otros intereses de igual importancia jurídica. Por ello, un ejercicio jurídico como el empleado en la opinión disidente merece nuestro rechazo.

*B. El sacrificio de la misión principal en aras de vindicar las misiones accesorias*

Finalmente, la opinión disidente argumenta que la opinión mayoritaria adolece de una "visión reduccionista sobre el concepto de la Universidad", ya que concibe a ésta como una mera "casa de estudios" y "niega la realidad de la multiplicidad de misiones, objetivos, funciones y aspiraciones de la institución". Opinión disidente de la Jueza Asociada, señora Fiol Matta, pág. 15. Citando porciones de la Ley Universitaria, la ponencia minoritaria reconoce que la misión de la Universidad ampara –además de su finalidad como centro de enseñanza– la producción de cultura y servicio al pueblo puertorriqueño. Íd., pág. 17-18. Además, la compañera Jueza Asociada, señora Fiol Matta, articula que "no podemos situar al estudiante como un ente pasivo, cuya vida académica ha de limitarse a recibir y transmitir una herencia cultural", sino que, "en el contexto de un intercambio activo y una educación dinámica, [éste] se forma autónoma y racionalmente dentro de la 'casa de estudios' [como] las mujeres y los hombres líderes del mañana". Íd., pág. 17, 18, 19 y 20.

También somos del criterio que la Universidad de Puerto Rico fue diseñada con propósitos adicionales a la mera impartición de conocimiento en sus aulas de clase. Igualmente, es imperativo que el estudiante aproveche al máximo las vastas posibilidades que nuestro primer centro docente le brinda para desarrollar su intelecto, juicio

crítico, expresividad, servicio al pueblo puertorriqueño y "las diferentes dimensiones de su personalidad moral".

Ahora bien, la misión primordial y esencial de nuestra Universidad lo representa la enseñanza y la impartición ávida de toda faceta del conocimiento. Una vez se garantiza esta misión primaria mediante un ambiente ordenado y pacífico, se faculta la posibilidad de cultivar la multiplicidad de misiones accesorias -pero no menos importantes- que la Ley Universitaria y la costumbre le han reconocido a nuestro primer centro docente.

Ciertamente -y como bien indica la opinión disidente- el estudiante no es un "ente pasivo" que se limita a la función mecánica de estudiar y enriquecer su intelecto. Coincidimos que nuestra Universidad le debe proveer al estudiante un escenario adecuado que faculte el desarrollo de su carácter moral, la definición de concepciones particularizadas de los diferentes matices de nuestra vida política, social y económica, y la incorporación a su esencia como ser humano de "un intercambio activo y una educación dinámica" que propenda al desarrollo de su persona como potencial "líder del mañana". Sin embargo, omitir reconocer límite alguno al derecho a la libertad de expresión de los estudiantes favorece resultados adversos a los postulados nobles que la opinión disidente sugiere que nuestra Universidad debe aspirar ser. El acto de enclaustrar nuestro recinto por largos periodos de tiempo y el vindicar manifestaciones estudiantiles que impidan el

acceso de los miembros de la comunidad universitaria a nuestra institución docente, impide que ésta alcance misión alguna de las reconocidas por la ponencia minoritaria.

En la opinión disidente no encontramos contestación a las siguientes interrogantes: ¿Con una Universidad cerrada se puede enseñar?; ¿Con una Universidad cerrada se puede desarrollar "un intercambio activo y una educación dinámica"?; ¿Con una Universidad cerrada los diferentes componentes de la comunidad universitaria pueden surcar un progreso de diálogo y discusión ilustrada?; ¿Con una Universidad cerrada el estudiante puede convertirse en un "ente activo" que logre "aprovecharse del valor educativo de toda gestión universitaria"?; ¿Con una Universidad cerrada "producimos cultura y servimos al pueblo puertorriqueño"?  La respuesta obvia es *no*.

Primordialmente la Universidad es una casa de estudios.  Así lo reconoció el Juez Asociado Rigau en su opinión disidente en <u>Pagan Hernandez v. Universidad de P.R.</u>, 107 D.P.R. 720, 753 (1978)  al declarar que

> La Universidad es la casa de estudios por excelencia y allí los valores primarios deben ser la calidad moral y la competencia intelectual. La Universidad necesita un *clima de paz* y *debe allí haber gran tolerancia para las ideas más dispares pero no para la violencia. La violencia es destructiva de la vida universitaria*. (Énfasis nuestro).

Como Tribunal, nos corresponde vindicar la misión primaria de la Universidad.  Esto es, servir como centro pedagógico y docente.  Sólo así podemos garantizar que las

misiones accesorias reseñadas por la ponencia disidente de la Jueza Asociada, señora Fiol Matta, alcancen su cumplimiento.

## III

Mediante las expresiones vertidas en este voto particular reafirmo mi visión de que nuestra sociedad es una de ley y orden. Indubitablemente, el derecho a la libertad de expresión no es licencia para la anarquía y mucho menos un instrumento para el atropello de los derechos de otros a beneficiarse del cúmulo de recursos que nuestro sistema universitario puede ofrecer. Mediante nuestra decisión no sacrificamos el derecho a la libertad de expresión de los estudiantes, sino que creamos un balance de intereses entre el derecho de éstos y el orden y la civilidad que garantizará la impartición de vida a la institución centenaria que representa nuestra Universidad de Puerto Rico.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Universidad de Puerto Rico
        Peticionaria


                v.


Gabriel Laborde Torres y otros
        Recurridos



                        CT-2010-08



Opinión disidente emitida por la Jueza Asociada señora Fiol Matta




        En San Juan, Puerto Rico, a 28 de diciembre de 2010.

> "[La Universidad] necesita también contacto con la existencia pública, con la realidad histórica, con el presente, que es siempre un integrum… La Universidad tiene que estar abierta a la plena actualidad; más aún: tiene que estar en medio de ella, sumergida en ella".[4]
>  — MISIÓN DE LA UNIVERSIDAD, JOSÉ ORTEGA Y GASSET —

> "Confiamos, además, que la nueva forma de convivencia académica propuesta, marque el desarrollo de un clima de mutua cooperación y respeto entre la administración, el personal universitario y los estudiantes, para cuya formación y beneficio, nuestro gobierno no ha escatimado esfuerzos ni recursos".[5]
>  — INFORME DE LA COMISIÓN DE INSTRUCCIÓN Y CULTURA DE LA CÁMARA, 1965 —

---

[4] J. Ortega y Gasset, La Misión de la Universidad, Madrid, Ed. Alianza Editorial, S.A., 1930, pág. 21.

[5] Informe de la Comisión de Instrucción y Cultura, P. de la C. 353, 7 de diciembre de 1965, pág. 20.

La decisión de la cual disiento en el día de hoy es histórica, primordialmente, por la falta de concordancia entre la controversia planteada por el recurso de apelación y las expresiones del Tribunal.[6] El resultado ha sido una Opinión que, en su afán de controlar el resultado del proceso que se dará a nivel de primera instancia, ha impuesto pautas a ese foro que son tanto improcedentes, como ambiguas. Ese mismo objetivo ha convertido la mayor parte de la Opinión en un *dictum* sin precedente.

Además, si bien es cierto que la Opinión mayoritaria parece reconocer en algunas oraciones el derecho a la libertad de expresión del estudiantado, sus palabras son negadas por su razonamiento y conclusiones sobre la relación Estudiante/Universidad. Por eso, me temo que la consecuencia de esta decisión sea abrir la puerta a que se vulneren derechos constitucionales fundamentales de los estudiantes de nuestro primer centro docente. Por esa razón, y porque entiendo que no debemos invadir el espacio de discreción que antes hemos reconocido al Tribunal de Primera Instancia, me veo en la obligación de expresar mi opinión.

---

[6] La Opinión del Tribunal, Universidad de Puerto Rico v. Laborde Torres et als., fue emitida el de 13 de diciembre de 2010. En ese momento me acogí al término de diez días dispuesto en la Regla 5(b) de nuestro Reglamento. 4 L.P.R.A. Ap. XXI-A, R. 5(b).

I

Al enfrascarse en desarrollar pautas para guiar la discreción del Tribunal de Primera Instancia, la mayoría utiliza un lenguaje innecesariamente inclusivo que engloba a todo el estudiantado de la Universidad bajo el poder de un *injunction* solicitado, pero aún no concedido. Este uso de la frase vaga y totalizadora de "los estudiantes" no tiene mérito alguno, ya que el estudiantado en general no fue incluido como parte en la demanda.[7] En segundo lugar, los señalamientos de la mayoría en torno a los pormenores del contenido, entiéndase el alcance y la cualidad, del *injunction* son tan amplios que la procedencia de ese remedio se convierte, en cierto sentido, en una cuestión ya prejuzgada fuera del foro correspondiente.

La mayoría, citando a <u>Madsen v. Women's Health Ctr.</u>, 512 U.S. 753 (1994), resalta que el *injunction*, para regular las actividades y, tal vez, la expresión de un grupo en particular, está justificado siempre y cuando esté basado en una disputa específica entre partes reales. *Íd.*, a la pág. 762. Además, se refiere al grupo a ser afectado por el *injunction* como uno cuyos

---

[7] Véase, E. Fontánez Torres, <u>El discurso legal en la construcción del espacio público: Las playas son públicas, nuestras, del pueblo</u>, Revista de Ciencias Sociales 20, verano 2009, pág. 42, y E. Fontánez Torres, <u>La pretensión totalizadora del Derecho: juridificación de controversias en Puerto Rico</u>, Ponencia presentada en la Universidad de Buenos Aires, Instituto GIOJA, I Jornada para Jóvenes Investigadores de Derecho y Ciencias Sociales "Sociedad, Derecho y Estado en cuestión" del 29 de octubre de 2009.

componentes compartan la misma visión sobre determinado asunto. *Íd.*, a la pág. 763. Ahora bien, en el caso ante nuestra consideración el grupo particular al que se dirigiría la demanda de *injunction* incluye al Presidente del Consejo General de Estudiantes y a varios líderes estudiantiles (los demandados). Simplemente, no entendemos cómo la Opinión da por sentado que el *injunction* aplicaría a "los estudiantes" no incluidos como parte sin considerar, entre otras, las siguientes interrogantes.

¿Aplicaría el *injunction* a todos los estudiantes de la Universidad por el mero hecho de que una orden judicial de *injunction* penda sobre el Presidente del Consejo General y algunos estudiantes? De ser la respuesta en la afirmativa, y presumiendo que la orden se extienda al Consejo General, ¿están todos los estudiantes, en este contexto, legalmente identificados con éstos, o con el Consejo, al momento realizar sus actos **individuales** de expresión? Por otro lado, ¿aplicaría el interdicto a estudiantes que lleven a cabo otros actos de expresión por su cuenta, sin participar en los eventos celebrados por el Consejo General ni responder a su llamado? ¿Estaría prohibido cualquier acto, por decisión individual de un estudiante, cuyo fin se pueda definir ampliamente como "impedir" el paso a

los espacios universitarios, aunque sea de forma no violenta y persuasiva?[8]

Es evidente el peligro que presenta el lenguaje inclusivo utilizado por la mayoría en el caso ante nuestra consideración. Este lenguaje engloba a "los estudiantes" de manera general y sin criterio alguno. De esa forma, abre la puerta a que cualquier estudiante de la comunidad universitaria advenga violador del *injunction,* **si es que éste se concede,** por el sólo hecho de ejercer su derecho a manifestarse. Procedo a ilustrar con más detalles dicho señalamiento.

Según la Regla 57.5 de las Reglas de Procedimiento Civil de 2009,[9] "[t]oda orden que conceda un entredicho provisional o un *injunction* preliminar o permanente… **[s]erá obligatoria solamente para las partes en la acción, sus oficiales, agentes, sirvientes, empleados y abogados y para aquellas personas que actúen de acuerdo o participen activamente con ellas** y que reciban aviso de la orden mediante cualquier forma de notificación".[10] (Énfasis nuestro). De esta regla se desprende que su alcance puede extenderse, más allá de las partes en la acción judicial, a terceros que realicen el acto

---

[8] Recalco de entrada, y quizás innecesariamente, que habré de referirme en esta Opinión solamente a expresiones y manifestaciones estudiantiles pacíficas. No endoso los actos violentos que puedan llevar a cabo ciertos individuos, estudiantes u otros, aprovechando esos eventos.

[9] 32 L.P.R.A. Ap. V.

[10] 32 L.P.R.A. Ap. V, R. 57.5.

prohibido, sujeto a dos condiciones: que tengan un vínculo legal con los demandados de tal naturaleza que requiera la extensión de la prohibición, o que hayan actuado en concierto con la parte contra quien se emite el *injunction*.

Desafortunadamente, el alcance de este remedio extraordinario sobre personas ajenas al pleito es un tema poco atendido en nuestra jurisdicción. Nuestros tratadistas tampoco abundan mucho sobre ello. El doctor Cuevas Segarra arroja algo de luz, al expresar que "[e]n estos casos, debe demostrarse que la persona no incluida como parte, participó en el acto o está legalmente identificado con el demandado".[11] Además, señala que "[l]a totalidad de las circunstancias indicará si una persona no demandada en el epígrafe del interdicto, está obligada por éste".[12]

A su vez, el tratadista Rivé Rivera explica que el lazo jurídico requerido, conocido en el "common law" como *privity*, se define como aquel que ata al tercero en **solidaridad jurídica** a la parte demandada.[13] Sin embargo, no elabora sobre el significado del requisito

---

[11] J. Cuevas Sergarra, <u>Tratado de Derecho Procesal Civil</u>, Tomo II, San Juan, Publicaciones JTS, 2000, pág. 1066.

[12] *Íd.* Véase, además, M. Velázquez Rivera, <u>Redescubriendo el Injunction</u>, Forum, Año 1, Núm. 1, Enero-Marzo 1958, págs. 18-22.

[13] D. Rivé Rivera, <u>Recursos Extraordinarios</u>, 2d. ed., San Juan, Programa de Educación Jurídica Continua, Universidad Interamericana de Puerto Rico, 1996, pág. 47.

de "actuar de acuerdo" con las partes. Como alternativa, remite a una célebre sentencia del juez Learned Hand, que sostiene que un *injunction* no puede ser tan amplio que equivalga a emplazar al mundo entero. Por tanto, "…the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party. **This means that the respondent must either abet the defendant, or must be legally identified with him**".[14] (Énfasis nuestro).

Careciendo, pues, de jurisprudencia o doctrina propia sobre este tema de gran interés, me veo obligada a recurrir a la jurisprudencia federal por su evidente valor persuasivo.[15] Vale señalar que el equivalente de nuestra Regla 57.5 de Procedimiento Civil de 2009 en la jurisdicción federal es la Regla 65 de Procedimiento

---

[14] <u>Alemite MFG Co., v. Staff</u>, 42 F.2d 832, 833 (2nd Cir., 1930).

[15] Véase, <u>Rivera Castillo v. Mun. de San Juan</u>, 130 D.P.R. 683 (1992), <u>Cuadrado Carrión v. Romero Barceló</u>, 120 D.P.R. 432, 448 (1988). No obstante, recordemos que al aquilatar el valor persuasivo de la jurisprudencia interpretativa de un estatuto, adoptado en parte o en su totalidad de otra jurisdicción, siempre es necesario tomar en cuenta, de manera principal, los principios que rigen nuestro ordenamiento jurídico. <u>Arce Brucetta v. Motorola Elec. de P.R.</u>, res. el 9 de abril de 2008, 2008 T.S.P.R. 59. Véase, además, <u>P.R. Fuels v. Empire Gas</u>, 149 D.P.R. 691 (1999); <u>Peña Clos v. Cartagena Ortiz</u>, 114 D.P.R. 576 (1983).

Civil federal, cuyas disposiciones en la parte que nos concierne son idénticas.[16]

En cuanto a este asunto, el Tribunal Supremo federal se ha expresado en contadas ocasiones sobre el alcance del *injunction* sobre terceros no incluidos como parte demandada. En 1934, el máximo foro federal se expresó como sigue: "It is true that persons not technically agents or employees may be specifically enjoined from knowingly aiding a defendant in performing a prohibited act **if their relation is that of associate or confederate**".[17] (Énfasis nuestro). Posteriormente, el Tribunal Supremo federal aplicó la doctrina del "common-law" que reconocía que el *injunction* puede obligar a terceros, en la medida en que éstos se identifiquen con la parte en el pleito judicial, bajo una de estas premisas: "… a decree of injunction not only binds the parties defendant but also those identified with them in interest, in '*privity*' with them, represented by them or

---

[16] "(d) Contents and Scope of Every Injunction and Restraining Order.
   […]
   (2) *Persons Bound.* The order binds only the following who receive actual notice of it by   personal service or otherwise:
        (A) the parties;
        (B) the parties' officers, agents, servants, employees, and attorneys; and
        (C) other persons who are in active concert or participation with anyone described in
   Rule 65(d)(2)(A) or (B)". USCS Fed. Rules Civ. Proc. R. 65(d)(2).

[17] Chase Nat'l Bank v. Norwalk, 291 U.S. 431, 436-437 (1934).

subject to their control".[18] En la jurisdicción federal, el término *privity* se define de la siguiente manera: "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceedings, or piece of property)". Además, se reconoce otra acepción al vocablo, a saber: "[m]utuality of interest".[19]

Los tratadistas Wright, Miller & Kane tratan el asunto de *privity* en el contexto de las organizaciones o asociaciones no-incorporadas. Explican que, como consecuencia del requisito de *privity*, a los miembros de una organización no se les puede hallar incursos en desacato por violar un *injunction*, sobre la base de que los oficiales de la organización fueron emplazados y están sujetos a sanciones si violan la orden de *injunction*:

> Perhaps it is because members of associations and organizations are not specifically listed as a category of persons bound by a decree; yet, in most contexts they would qualify as 'persons in active concert or participation'… there may be a

---

[18] Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14 (1945). Véase, además, Nat'l Spiritual Assembly of the Bahá'ís Under the Hereditary Guardianship v. Nat'l Spiritual Assembly of the Bahá'ís, *2010 U.S. App. LEXIS 24028, 4 (8th Cir., 2010), donde se expuso lo siguiente:* "…the "legal identity" justification for binding nonparties is limited to those who have notice of the injunction and are so closely identified in interest with the enjoined party that it is **reasonable to conclude** that their rights and interests were adjudicated in the original proceeding".

[19] Black's Law Dictionary, 9th ed., West Publishing Co., 2009, pág. 1320.

> reluctance to bind the members of an organization unless it has effective control over and actually speaks for its membership with regard to the sphere of activity affected by the court's order and unless it is clear that the interests of the individuals comprising the group were fully represented in the injunction proceeding. Unions appear to meet these qualifications. Wright, Miller & Kane, Federal Practice and Procedure, Minn, West Publishing Co., 1995, pág. 356.[20]

Según el Reglamento General de Estudiantes de la Universidad de Puerto Rico, Reglamento Núm. 7733, Departamento de Estado, 9 de septiembre de 2009, el Consejo General tiene facultad para representar oficialmente al estudiantado en los actos celebrados dentro y fuera del recinto, servir de foro para la discusión, convocar a asambleas, someter recomendaciones, realizar actividades culturales, académicas, educativas, y participar en la creación y enmienda de reglamentos, entre otras.[21] El Consejo General no tiene el poder de

---

[20] Según indica el texto citado, las uniones obreras son la excepción a la regla. Para un análisis sobre la falta de estructura formal de los movimientos sociales, véase, J. Raschke, Sobre el concepto de movimiento social, Revista Zona Abierta 69, Madrid, Ed. Pablo Iglesias, 1994, pág. 121. Éste define el mismo como un "actor colectivo" que no constituye un simple medio del cambio social, como tampoco "la pasiva expresión de tendencias sociales de cambio, sino que, en mayor medida, son actores que se involucran activamente en el curso de las cosas con el fin de influir sobre ese desarrollo". Íd., a la pág. 123. También los destaca, **particularmente, por su amplitud que rebasa cualquier organización en la cual pueden actuar o ser representados.** Íd., a la pág. 126.

[21] Art. 3.4 del Reglamento General de Estudiantes de la Universidad de Puerto Rico, Reglamento Núm. 7733, Departamento de Estado, 9 de septiembre de 2009.

representar a todo el estudiantado en todas las incontables actividades y todos los actos que constituyen expresión. Tampoco se contempla en ninguna parte de la disposición antes mencionada la posibilidad de que el Consejo General pueda controlar efectivamente las actividades de sus miembros. Concluir lo contrario nos llevaría a la ilógica conclusión que cada uno de los estudiantes que se expresan dentro y fuera de los predios de la Universidad está sujeto a una estricta fiscalización y control por parte del Consejo General. Esto significaría que los estudiantes, como seres humanos libres, no podrían actuar independientemente de cualquier pronunciamiento de su cuerpo representante ante la Administración.

Por otro lado, el Tribunal Supremo federal no se ha expresado concretamente sobre lo que significa "active concert" según la Regla 65(d)(2)(C) federal, o sea, el "actuar de acuerdo" de nuestra Regla 57.5. A nivel apelativo federal, en NBA Properties, Inc. v. Gold,[22] se requirió prueba de que se había ayudado o asistido a violar el *injunction* para confirmar la existencia del acto concertado. O sea, que había que: "…'aid and abet' the party to violate a decree".[23] Por ello, el haber

---

[22] 895 F.2d 30 (1st Cir., 1990).

[23] *Íd.*, a la pág. 33. Véase, además, G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 35 (1st Cir., 1980); United Pharmacal Corp. v. United States, 306 F.2d 515, 517 (1st Cir., 1962); Alemite MFG Co., v. Staff, *supra.*

incurrido en el acto prohibido no significa automáticamente que se extienda el *injunction* para cubrir a un tercero no incluido como parte aunque:

> Similarly, **the mere fact that a person has committed the enjoined act does not necessarily mean that the injunction should be enforced against him.** Generally speaking, only if a person has acted in concert with those named in the injunction or is an officer, agent, servant, employee, or attorney of a named party… is that person in privity with those enjoined and amenable to being bound by the decree.[24] (Énfasis nuestro).

En resumidas cuentas, si un *injunction* aplica a terceros que no fueron incluidos como parte es un asunto que lo decidirá el Tribunal de Primera Instancia caso a caso, de acuerdo a su apreciación de los hechos particulares de cada situación. Sin embargo, al referirse repetidamente a la aplicación del *injunction* contra "los estudiantes", la mayoría parece presumir, *sub silentio*, que todos "los estudiantes" actúan en acuerdo con el Consejo General. Con ello se abre la probabilidad de violaciones al derecho al debido proceso de ley de los individuos que componen el estudiantado, pues sería suficiente identificarlos como tal para aplicarles las sanciones del *injunction*, sin necesidad de presentar prueba de que cada uno actuó en concierto con el Consejo General, y sin darles la oportunidad de defenderse demostrando que sus actos fueron independientes de esa

---

[24] Wright, Miller & Kane, <u>Federal Practice and Procedure</u>, Minn, West Publishing Co., 1995, pág. 341.

parte. Respecto a esto, el máximo foro federal ha reiterado en varias ocasiones lo siguiente: "[t]he courts, nevertheless, may not grant an enforcement order or injunction so broad **as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law**".[25] (Énfasis nuestro).

En este contexto, hay que mirar más de cerca lo que dice la mayoría sobre el alcance del contenido del *injunction*. La Opinión recomienda que cuando el foro primario pondere el recurso, el remedio sea "…estrechamente diseñado para impedir la entrada y salida del campus…".[26] Esta directriz es extremadamente preocupante, ya que adjudica un asunto que no está en controversia en esta etapa del caso. Tristemente, es consistente con el resto de la Opinión.

Primero, la Opinión interviene indebidamente y, al hacerlo, menoscaba la discreción que tiene el juzgador de los hechos para determinar, no tan sólo la procedencia

---

[25] Golden State Bottling Co. v. NLRB, 414 U.S. 168, 180 (1973); Regal Knitwear Co. v. NLRB, *supra*, a la pág. 13; Chase National Bank v. Norwalk, *supra*, a la pág. 436-37; Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229,234 (1917). Además, véase, Nat'l Spiritual Assembly of the Bahá'ís Under the Hereditary Guardianship v. Nat'l Spiritual Assembly of the Bahá'ís, *supra, citando a Regal Knitwear, supra, expone lo siguiente:* "The "legal identity" component of this rule often operates to bind a party's successors and assigns, and sometimes other nonparties as well, but only when doing so is consistent with due process".

[26] Universidad de Puerto Rico v. Laborde Torres et als., Opinión mayoritaria, res. de 13 de diciembre de 2010, págs. 54-55.

del recurso extraordinario, sino los elementos específicos de la orden.[27]

Segundo, la Opinión mayoritaria pretende diseñar un *injunction* con los fundamentos y cuestiones fácticas del pasado conflicto universitario. Así, la Opinión ignora un principio cardinal del recurso extraordinario del *injunction*: "[e]l injunction se concede siempre a tenor con los hechos prevalecientes a la fecha de la vista y no a aquellos existentes al momento de presentar la demanda de *injunction*".[28]

Tercero, la recomendación dictada por la mayoría estructura el contenido de la orden de forma tan amplia que ignora la extensa gama de posibles expresiones que pueden realizar los estudiantes en son de protesta pacífica. Las vías expresivas del estudiantado de nuestra Universidad son tan diversas, múltiples y heterogéneas que no se puede, con consciencia tranquila, ordenar lo que la Opinión mayoritaria recomienda sin violar al estudiantado el derecho a la libertad de expresión.[29]

---

[27] 32 L.P.R.A. sec. 3522; E.L.A. v. Asoc. de Auditores, 147 D.P.R. 669, 680 (1999); Misión Industrial v. Junta de Planificación, 142 D.P.R. 656, 698 (1997) (Opinión de conformidad, Juez Asociado Hernández Denton); Delgado v. Cruz, 27 D.P.R. 877, 880 (1919). Véase, además, D. Rivé Rivera, *supra*, a la pág. 23.

[28] R. Hernández Colón, Práctica Jurídica de Puerto Rico, Derecho Procesal Civil, San Juan, Equity Publishing, 2010, pág. 528. Véase, además, Trigo Hermanos, Inc. v. Sobrino de Izquierdo, Inc., 72 D.P.R. 449 (1951); Las Monjas Racing Corp. v. Comisión Hípica, (1940).

[29] "An improvidently secured injunction may have the effect of polarizing resistance to university discipline.

II

Ahora bien, el asunto más inquietante de la Opinión lo encontramos en el último trecho de la ponencia mayoritaria. Éste adolece de una visión reduccionista sobre el propio concepto de la Universidad, a partir de la cual simplifica excesivamente la controversia. La concepción de la Universidad que aporta la voz mayoritaria no responde al propósito y los fines de esa institución, pues pretende limitar la misión de la Universidad a una interpretación restrictiva de la arquetípica "casa de estudios". La visión mayoritaria niega la realidad de la multiplicidad de misiones, objetivos, funciones y aspiraciones de la institución. El problema es que, al analizar la controversia desde su reducida perspectiva, la Opinión se embarca en disquisiciones sobre asuntos constitucionales que no fueron planteados ante el foro primario.

*A*

La Opinión mayoritaria parte de la visión clásica de la Universidad como "casa de estudios". Sin embargo, la verdadera "casa de estudios" no almacena las ideas en anaqueles ni reconoce solamente las que están en su

---

Improper resort to the injunction for purposes of restraining the exercise of First Amendment freedoms may result in lower court denials or appellate court reversals embarrassing to the university, and may contribute to the argument of dissidents that the university does not respect basic constitutional rights". Report of the American Bar Association Commission on Campus Government and Student Dissent, ABA Foundation, Chicago, 1970, pág. 28.

catálogo. Por eso, aunque coincido en que la misión primordial de la Universidad es ser una "casa de estudios", me asombra que sirva esto de justificación para el tono autoritario y represivo con el que la Opinión analiza los derechos del estudiantado y las prerrogativas de la Administración.

De inicio, no coincidimos con las expresiones de la mayoría sobre el efecto negativo de las manifestaciones estudiantiles. Para la mayoría, las protestas universitarias crean polémicas entre los estamentos de nuestro primer centro docente y generan gran tensión en Puerto Rico. Este análisis evade la posibilidad de que las manifestaciones, en vez de causar desasosiego, sean *resultado* del descontento social producido.[30]    Más importante aún, ignora la naturaleza de la Universidad como un centro de intercambio de ideas que, por su propia función, fomenta relaciones dinámicas entre sus miembros que muchas veces trascienden lo verbal e incluso el plano físico de nuestro primer centro docente.    Ello es testamento a la Universidad como "centro de ebullición, de irradiación de valores y de circulación de reclamos

---

[30] Independientemente de los sucesos concretos que operan como catalítico de los conflictos universitarios, éstos pueden explicarse por la conjunción de diversos factores, entre ellos "las tensiones provenientes del contexto económico-social del país" y "los sentimientos de alienación que abonan al descontento estudiantil ante un aparato institucional y una 'comunidad universitaria' de los cuales no logran sentirse parte cabalmente". L. Nieves Falcón, <u>Huelga y Sociedad: análisis de los sucesos en la U.P.R. 1981-1982</u>, Barcelona, Ed. Edil, 1982, pág. 27.

cruciales en nuestra vida de pueblo".[31] Por tanto, decir que los actos de expresión estudiantil desencadenan *sui generis* el malestar general en nuestro Pueblo es irresponsable y desacertado.

Tampoco es correcta la restrictiva visión educativa que somete al estudiantado a una posición de pasividad. Por el contrario, conforme surge del Informe del Comité de Educadores ante la Cámara de Representantes: "[d]entro de los conceptos de una **educación dinámica** que respeta el desarrollo de la personalidad humana, **no podemos situar al estudiante como un ente pasivo, cuya vida académica ha de limitarse a recibir y transmitir una herencia cultural.** Toda la vida universitaria educa. **Las oportunidades de participación estudiantil que deseamos garantizar no son meras concesiones de unos adultos a unos jóvenes, sino más bien un esfuerzo honesto para aprovechar el valor educativo de toda gestión universitaria".**[32] (Énfasis nuestro).

El artículo 2 de la Ley Núm. 1 de 20 de enero de 1966, conocida como la Ley de la Universidad de Puerto Rico,[33] establece los diversos objetivos de la Universidad y resume su misión en el binomio de producir cultura y

---

[31]  E. Rivera Ramos, La universidad y lo posible, 78 Rev. Jur. U.P.R. 643, 659 (2009).

[32]  Informe de la Comisión de Conferencia del P. de la C. 353, de 7 de diciembre de 1965, pág. 14.

[33]  18 L.P.R.A. sec. 601 *et seq.*

servicio al Pueblo de Puerto Rico.[34] Esta misión principal de nuestro primer centro docente se sostiene en la perpetuación y transmisión del conocimiento por parte del claustro y en la responsabilidad de los egresados de difundir ese conocimiento en la práctica, para el beneficio colectivo de nuestra sociedad. A eso se refiere el historial legislativo cuando reconoce que "[s]iendo la Universidad **máxima casa de estudios, sus objetivos y funciones deben ser aplicados por entero al estudiante.** El concepto de **la 'formación' del estudiante** que establece el proyecto precisa, por lo tanto, la aplicación de dos criterios: **deberá ser íntegra y orientada al servicio".**[35] (Énfasis nuestro).

A su vez, el artículo 7 de la Ley de la Universidad dispone que los estudiantes serán colaboradores en la misión de cultura y servicio de la Universidad y, como miembros de la comunidad universitaria, gozarán del "derecho a participar efectivamente en la vida de esa comunidad y **tendrán todos los deberes de responsabilidad moral e intelectual a que ella por su naturaleza obliga".**[36] (Énfasis nuestro). Ciertamente, los objetivos

---

[34]  18 L.P.R.A. sec. 601 (A)(1) y (2).

[35]  Informe de Comisión de Conferencia del P. de la C. 353, de 7 de diciembre de 1965, pág. 5.

[36]  18 L.P.R.A. sec. 609 (a). Cabe resaltar que nuestra jurisprudencia no ha tenido muchas oportunidades para interpretar la naturaleza de la "casa de estudios". Sin embargo, en Pagán Hernández v. U.P.R., 107 D.P.R. 720, 753 (1978), el Juez Asociado Rigau expresó en su Opinión disidente, lo siguiente: "[l]a Universidad es la casa de

de la Ley de la Universidad de Puerto Rico no pueden interpretarse de forma tan restrictiva que menoscaben las demás misiones de la Universidad. Al repasar las citadas disposiciones, debemos recordar que la norma de hermenéutica de analizar los motivos y finalidades de la norma jurídica conlleva "una delicada y compleja apreciación de los intereses prácticos y de ideales éticos y culturales, [que] [s]obre todo exige ahondar en las realidades de la vida, en sus exigencias económicas y sociales".[37]

La discusión y el diálogo entre los diversos componentes de la comunidad universitaria constituyen otro espacio dentro de la Universidad donde se puede cumplir con el binomio servicio/cultura. Es, en efecto, más allá del aula, en los espacios de participación estudiantil, donde se concretan estas oportunidades educativas que propenden al desarrollo de las diferentes dimensiones de la personalidad moral, donde se forjan los estudiantes con la calidad y responsabilidad moral que requiere nuestra Universidad. Estudiosos de la realidad universitaria han reconocido que es esta responsabilidad moral la que ha llevado a que, "con su activismo, los estudiantes hayan dado en más de una ocasión la voz de alerta que se corrija el rumbo en asuntos medulares de

estudios por excelencia y allí **los valores primarios deben ser la calidad moral y la competencia intelectual"**. (Énfasis nuestro).

[37] Castle Enterprises, Inc., v. Registrador, 87 D.P.R. 775, 788-789 (1963).

nuestra comunidad".[38]  Así, en el contexto de un intercambio activo y una educación dinámica, se forman autónoma y racionalmente dentro de la "casa de estudios" las mujeres y los hombres líderes del mañana.

En resumidas cuentas, por su trayecto centenario, la Universidad es nuestro proyecto público por excelencia. Es nuestra más preciada inversión para el futuro, no solamente para propiciarle al estudiantado títulos y oportunidades de movilidad social, sino para formar mujeres y hombres de bien, de consciencia.  Por eso no es posible concebir a la Universidad como un centro de aprendizaje, limitado a ser, prácticamente, una casa de cuido.  Se desprende de lo anterior que una apreciación correcta de una "casa de estudios" centrada en educar y rendir servicio a nuestro pueblo, debe, y puede, coexistir con el ejercicio de la responsabilidad moral de los estudiantes de expresar sus preocupaciones e inquietudes y manifestar su repudio a lo que les parezca objetable, claro está, de manera pacífica, lo cual no quita que sea a veces vociferante.  Sólo en esta coexistencia entre el salón de clases y el salón de la vida puede sobrevivir la Universidad como *integrum* de nuestra sociedad democrática, y así rendirle un verdadero servicio a Puerto Rico.

---

[38] E. Rivera Ramos, *supra*, a la pág. 659.

*B*

La Opinión mayoritaria le dedica una porción significativa de su ponencia a esclarecer la "controversia" sobre la definición y los límites de la huelga estudiantil. Estas expresiones son un claro y patente *dictum* en toda regla, pues no hay tal controversia ante la consideración de este Tribunal y su discusión poco abona a resolver la alegada academicidad de la demanda de *injunction*.

Como sabemos, la Administración presentó una Demanda Jurada, el 21 de abril de 2010, en la cual solicitó al foro de instancia que emitiera un entredicho provisional, un interdicto preliminar y permanente y un interdicto posesorio. Además, incluyó otras causas de acción bajo la Ley sobre Perturbación o Estorbo,[39] y en daños y perjuicios contra la parte demandada. Al instar la demanda, la Administración no formuló alegación alguna acerca del derecho de los estudiantes a irse a la huelga. Posteriormente, el Tribunal de Primera Instancia emitió un entredicho provisional, el 22 de abril de 2010, y un interdicto preliminar, el 30 de abril de 2010, en los cuales nada expresó sobre este asunto. Más aun, con el fin de incluir a otros estudiantes como co-demandados, la Administración presentó una Demanda Enmendada Jurada el 19 de mayo de 2010 y tampoco hizo alegación al respecto. Una vez terminado el conflicto estudiantil, mediante el

---

[39] 32 L.P.R.A. sec. 2761 *et seq.*

mecanismo de mediación, el foro primario emitió una Sentencia Parcial y Orden, el 29 de junio de 2010, en la cual se limitó a declarar que la controversia era académica y ordenó que la acción en daños y perjuicios presentada por la Administración, junto a la Reconvención y Demanda contra Tercero presentada por los co-demandados, siguiera el trámite ordinario. Nada se dijo sobre la situación de la "huelga". Luego, en su recurso de *apelación* presentado ante el Tribunal de Apelaciones, la Administración hizo tan sólo dos señalamientos de error, ambos relacionados a la academicidad de la controversia.[40] Nuevamente, no levantó controversia alguna sobre la naturaleza de la "huelga".

_____

[40] Dichos señalamientos fueron a los efectos que debía revocarse el dictamen porque a.) "erró manifiestamente el TPI [sic] al concluir que la causa de acción de injunction permanente se torno [sic] en académica toda vez que el cese voluntario de la conducta de los demandados no tiene carácter de permanencia" y, b.) "erró manifiestamente [el] TPI [sic] al concluir que la amenaza de huelga en un futuro cercano es incierta toda vez que los demandados no cumplieron con su obligacion [sic] de establecer que no hay expectativa razonable de que no habrá otra huelga próximamente". *Recurso de Apelación* ante el Tribunal Supremo, 13 de julio de 2010, pág. 13.

La controversia sobre el derecho a la libertad de expresión de los estudiantes se planteó por primera vez en el *Recurso de Certificación Intrajurisdiccional*, presentado por la Administración ante este Tribunal el 14 de julio de 2010. Éste indica que "… este caso brinda a este Honorable Tribunal una oportunidad propicia para dar respuestas a interrogantes constitucionales sustanciales que han sido objeto de debates sociales y académicos por décadas: ¿puede un grupo de estudiantes, so pretexto de ejercer su derecho de libertad de expresión, tomar control de la UPR? ¿Está tutelado por el derecho de libertad de expresión el que estudiantes tomen por asalto los portones y accesos de la UPR para llevar a cabo una protesta estudiantil? ¿Qué limites pueden imponerse al

A la luz de lo antes dicho, las expresiones en torno a la huelga estudiantil son, como mínimo, improcedentes e intranscendentales para efectos de descargar nuestro deber ministerial de revisar el dictamen emitido por el foro primario. Este Tribunal ha recalcado en varias ocasiones que las expresiones innecesarias acerca de interrogantes jurídicas que no le han sido planteadas propiamente no sientan precedente jurídico alguno.[41] Es decir, los pronunciamientos sobre asuntos que no están en controversia "simplemente se deben tener por no puestos, ya que no constituyen parte necesaria del fallo, sino que muchas veces son meras expresiones judiciales excesivas e

---

ejercicio de tal derecho en este contexto". *Íd.*, a la pág. 2. Este planteamiento, a su vez, responde a que uno de los co-demandados, en su *Contestación a Demanda*, expresó que "los remedios solicitados por la parte demandante… implican un menoscabo de patente intensidad de derechos constitucionales fundamentales de los co-demandados". *Apelación*, a la pág, 6.

La Opinión mayoritaria reconoce en su ponencia que la Administración le requirió que se pronunciara sobre este aspecto y con ello explica la inclusión de este tema, considerando que "… será imprescindible limitar la actividad expresiva para que ésta sea cónsona con los propósitos pedagógicos del recinto académico". Universidad de Puerto Rico v. Laborde Torres et als., *supra*, a la pág. 57.

Ciertamente, las preguntas que nos hace la Administración en su *Recurso de Certificación* deben ser objeto de un debate social y académico, pero ello no significa que constituyan, por consiguiente, una controversia jurídica que se debe resolver en esta etapa del trámite judicial, máxime cuando no fue planteada ante el foro primario.

[41] Véase, Suárez v. C.E.E. V, 163 D.P.R. 541 (2004); Ortiz v. Panel F.E.I., 155 D.P.R. 219 (2001); Martínez v. Registrador, 54 D.P.R. 7 (1938); P.G.R.R. Co. v. Antonetti et al., 17 D.P.R. 325 (1911).

innecesarias". <u>Ortiz v. Panel F.E.I.</u>, *supra*, a la pág. 252-253. Ahora bien, aún constituyendo *dictum*, las expresiones de la mayoría sobre la "huelga estudiantil" no dejan de ser altamente preocupantes. Por tanto, procede esclarecer ciertas cuestiones sobre este asunto.

El mencionado *dictum*, además de ignorar el movimiento social de la comunidad universitaria y desprestigiar la expresión estudiantil, reduce el vínculo entre la Universidad y su estudiantado a una mera relación contractual entre partes privadas. Esta percepción es contraria a la misión que históricamente ha representado la propia institución. Dicho análisis se fundamenta en una comparación literal entre estudiantes y obreros en el contexto de la "huelga". En sus partes pertinentes, la mayoría expresa que "[la] relación [de los estudiantes] con la universidad es de naturaleza contractual", y que "[c]ada estudiante firma un acuerdo con la U.P.R. en la que la segunda parte se compromete a enseñar y el primero a cumplir con sus deberes académicos".[42] Acto seguido, la mayoría remite a los artículos pertinentes del Código Civil de Puerto Rico que regulan los contratos.[43]

Esta reducción de la relación Estudiante/Universidad a una estricta relación contractual no encuentra base

---

[42]  <u>Universidad de Puerto Rico v. Laborde Torres et als.</u>, *supra*, a la pág. 69.

[43]  <u>31 L.P.R.A. secs. 2991, 2992, 2994, 3371, 3372, 3375, 3391</u>.

alguna en nuestro ordenamiento jurídico. Para fundamentarla, la Opinión recurre a dos casos: Ross v. Creighton University, 957 F. 2d 410 (7th Cir., 1992), y Zumbrun v. University 101 Cal Rptr. 499 (Cal. Ct. App. 1972). El primero se da en el contexto de la **universidad privada**. Además, los hechos de ese caso son enteramente distintos a los de la controversia que resuelve el Tribunal. En Ross, el demandante instó una acción en daños y perjuicios contra la universidad, porque ésta, a su entender, actuó de forma negligente al no proveerle ciertos servicios educativos prometidos por la administración.[44] El caso de Zumbrun, por su parte, resuelve también que la relación básica entre un estudiante y una **universidad privada** es de naturaleza contractual. *Íd.*, a la pág. 504.

Aunque hay varios casos estatales que conciben la relación Estudiante/Universidad Pública como contractual, la Opinión no se refiere a ellos, quizás porque también concluyen que, en ese contexto de una institución pública, las controversias no se pueden resolver aplicando estrictamente el Derecho contractual. Así concluyó el mismo tribunal apelativo que resolvió el caso citado por la mayoría, el del estado de California, en un

---

[44] Cabe resaltar que la acción en daños y perjuicios instada por el demandante se dividía en tres reclamos: "educational malpractice for not educating him, a new tort of 'negligent admission' to an educational institution, and negligent infliction of emotional distress". Ross v. Creighton University, 957 F. 2d 410, 413-414 (7th Cir., 1992).

caso mucho más reciente, <u>Kashmiri v. Regents of University of California</u>, 156 Cal. App. 4th 809, 825 (2007). El tribunal resolvió en este caso que la relación Estudiante/Universidad no debe encajonarse en una categoría doctrinal: "Although courts have characterized the relationship between the student and educational institution as contractual, they have recognized that contract law should not be strictly applied. **The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category.**"[45] (Énfasis nuestro) *Íd.*, a la pág. 825.

La Opinión del Tribunal recurre también a una comparación, que nada tiene que ver con la controversia de este caso, entre los estudiantes y los obreros, para concluir que los estudiantes no tienen derecho a "negociar colectivamente".[46] Aparte de que resulta evidente que los estudiantes no son obreros ni están cobijados por las garantías laborales pertinentes a éstos, ésta nos parece una discusión sin razón de ser, pues lo importante no es si los estudiantes tienen derecho a la huelga cual obreros, sino si tienen derecho

---

[45] Citando a <u>Lyons v. Salve Regina College, 565 F.2d 200, 202</u> (1st Cir. 1977).

[46] Universidad de Puerto Rico v. Laborde Torres et als., *supra*, a la pág. 67.

a expresarse, reunirse y manifestarse cual ciudadanos de este país.[47]

Las aseveraciones de la mayoría, en torno a la negociación colectiva, chocan con el propio Reglamento General de Estudiantes que faculta al Consejo General a **"proponer al Senado Académico, Rector y otros foros universitarios, la formulación de normas y políticas institucionales** sobre cualquier asunto que estimen pertinente **y recibir su respuesta oficial."**[48] (Énfasis nuestro). Aunque esta disposición no constituye el equivalente de "negociar colectivamente", sí establece, como mínimo, un requisito de diálogo productivo entre la Administración y los diversos miembros de la comunidad universitaria.[49]    Las expresiones de la mayoría

---

[47] Sin embargo, en <u>Andersen v. Regents of University of California</u>, 22 Cal. App. 3d 763 (1972), el tribunal incluyó unas expresiones muy interesantes en cuanto a su interpretación de la naturaleza de la relación contractual del estudiante con la Universidad Pública: "A contract is created with the state which, by its very nature, incorporates constitutional principles of due process. **Attendance at a publicly financed institution of higher education is to be regarded as a benefit somewhat analogous to that of public employment".** (Énfasis nuestro) *Íd.,* a la pág. 770.

[48] Reglamento General de Estudiantes de la Universidad de Puerto Rico, *supra,* Art. 3.4.

[49] Este principio de diálogo es ampliamente reconocido en el proceso de toma de decisión universitario. De esa forma, Corson se refiere a: "the **process or art with which scholars, students, teachers, administrators, and trustees associates together** in a college or university establish **and carry out the rules and regulations that minimize conflict, facilitate their collaboration, and preserve essential individual freedom".** (Énfasis nuestro) J. Corson, <u>Governance of Colleges and Universities</u>, New York, McGraw-Hill Book Company, Inc., 1960, págs. 12-13.

constituyen una negación tácita del derecho al diálogo de los estudiantes con la Administración, para el beneficio de ambas partes.

Como ya expresamos, los razonamientos que fundamentan el análisis de la mayoría rayan en el reduccionismo jurídico. Se trata de una tendencia hacia la simplificación de las controversias que, según explica la profesora Fontánez Torres, elimina de toda consideración los aspectos que no puedan reducirse al dualismo legal/ilegal, "opacando los asuntos subyacentes y convirtiendo el conflicto en uno de mera racionalidad legal".[50] Esto, precisamente, es lo que hace la Opinión mayoritaria al centrar una porción no despreciable de su ponencia en la discusión de la controversia sobre la legalidad/ilegalidad de los actos estudiantiles de cerrar la Universidad, lo cual, como ya mencionamos, es puro *dictum*.

Pero no por ello deja de tener efectos negativos y perniciosos. El enfoque mayoritario construye una realidad universitaria superficial, que reduce todo a que los estudiantes no tienen un derecho a la huelga, como los obreros, y a que sus funciones como estudiantes están delimitadas en derecho por un marco contractual. Con este proceder, se pretende privilegiar el orden público a costa de los derechos de libertad de expresión del

---

[50] E. Fontánez Torres, El discurso legal en la construcción del espacio público: Las playas son públicas, nuestras, del pueblo, *supra*, pág. 46.

estudiantado de nuestro primer centro docente. Sin embargo, el orden público "…no se comprende… no puede existir ni mantenerse si no se rinde constante tributo de respeto a la libertad individual, al derecho y la dignidad del hombre, porque si la opinión pública no puede manifestarse, el orden público es una quimera".[51]


                                    Liana Fiol Matta
                                    Jueza Asociada

---

[51] L. Martín-Retorquillo Baquer, La cláusula de orden público como límite – impreciso y creciente – del ejercicio de los derechos, Madrid, Ed. Civitas, S.A., 1975, pág. 11.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Universidad de Puerto Rico

    Peticionarios

       v.

                               CT-2010-08

Gabriel Laborde Torres
y
otros

    Recurridos

Voto particular emitido por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 28 de diciembre de 2010

> "La Justicia debe proteger la protesta y no acallarla."
>
> Roberto Gargarella

Las expresiones de la Jueza Asociada señora Fiol Matta así como del Juez Asociado señor Rivera García sobre la controversia que ha generado el caso de epígrafe, me obligan a reflexionar sobre la naturaleza del sistema de democracia constitucional que pregonamos se vive en nuestro país, y su interrelación con nuestra función como jueces. No hay duda que la forma en que el "nuevo" Tribunal piensa los valores democráticos que encarna nuestra Constitución es muy diferente a lo que considero necesario e imprescindible para que nuestra democracia siga su curso de crecimiento y enriquecimiento.

Al igual que el profesor Cass Sunstein, considero que una de las más grandes contribuciones del sistema de gobierno establecido en la Constitución de Estados Unidos es que garantiza la diversidad de opinión, el choque de ideas y la divergencia; valores que sin duda, recoge la nuestra. El profesor Sunstein señala: "The framer´s greatest innovation consisted … in their skepticism about homogeneity, their enthusiasm for disagreement and diversity, and their effort to accommodate and to structure that diversity. … As the framers stressed, widespread error is likely to result when likeminded people, insulated from others, deliberate on their own. In their view, heterogeneity of opinion can be a creative force. A Constitution that ensures the 'jarring of parties' and 'differences of opinion' will provide safeguards against unjustified extremism and unsupportable movements of view." Cass Sunstein, *Why Societies Need Dissent*, Harvard University Press, Mass., 2003, págs. 150-151.

Este ideal traza sus orígenes a la Antigua Grecia. Aristóteles sugería que cuando grupos divergentes o disímiles "all come together … they may surpass – collectively and as a body, although not individually— the quality of the few best … When there are many who contribute to the process of deliberation, each can bring his share of goodness and moral prudence; . . . some appreciate one part, some another, and all together

appreciate all." Aristóteles, *Politics,* 123 (E. Baker, trans. 1972).

El derecho a la libre expresión sirve para garantizar en nuestro entorno espacios para la disidencia y la diversidad. Es evidente que el derecho a la libertad de expresión es algo más que la protección debida al ciudadano para que éste se exprese, pues su importancia trasciende al interlocutor. "[E]xisten razones vinculadas al proyecto colectivo democrático", sobre las cuales se asienta este derecho. Érika Fontánez Torres, *Notas para el ejercicio de la protesta (Parte 2): Fiss, Primera enmienda, piquetes y protesta,* http://poderyambiente.blogspot.com. La profesora Fontánez Torres nos explica la postura del profesor Fiss sobre este asunto, citándole:

> Esta teoría, [la que centra la libertad de expresión en el orador o el individuo que se expresa], sin embargo, no explica acabadamente el especial compromiso que tiene la Constitución con la protección de la libertad de expresión. Se requiere una razón más importante para proteger la expresión, en la búsqueda de tal razón la teoría de la Primera Enmienda dominante vincula el derecho a la libertad de expresión con el interés de la sociedad en la democracia.

Owen Fiss, *Democracia y Disenso: una teoría de la libertad de expresión,* AD-Hoc, 2010, pág. 76, citado en Fontánez Torres, op. cit. Este derecho es entonces un valor fundamental para la supervivencia de la democracia. Como jueces, nuestra función debe ser garantizarlo, no emascularlo.

La democracia, a fin de cuentas, se asienta sobre el disenso. El derecho a protestar es, lo que se ha llamado, una de las caras de la libertad política en un sistema democrático.[52] Si consideramos que el verdadero poder o la verdadera autoridad reside en el pueblo, y que el gobierno es sólo un mandatario de éste, la crítica se torna, necesariamente, en uno de los fundamentos de toda democracia constitucional. Dicho de otra forma, si hemos delegado en el gobierno la toma de decisiones de aquello que nos afecta, "lo mínimo que podemos hacer es preservarnos el derecho de criticar a aquellos en los que hemos delegado todo." Esteban Rodríguez, No hay Democracia sin Protesta, Las Razones de la Queja, entrevista a Roberto Gargarella, www.ciaj.com/ar (última visita 29 de diciembre de 2010). Así entendido, logramos apreciar que el derecho a protestar, a disentir, a expresar nuestra disconformidad es un derecho que ejercemos por la sola razón de vivir en una sociedad democrática. Es por ello que venimos obligados a resguardarlo con especial rigor, porque lo que hacemos es en realidad, proteger la democracia misma. Véase Soto Martínez, *op. cit.*, pág. 7.

No debemos temerle al debate público robusto. Éste enriquece nuestra vida colectiva y es eje central para

---

[52] Véase, Victor Soto Martínez, *El derecho a la protesta y su expresión normativa,* en www.congresoconstitucional.cl/wp-content…/08/victorsoto_1252892663.pdf (última visita, 28 de diciembre de 2010).

que el ciudadano pueda seguir actuando como tal y de esta forma garantizar los valores democráticos que se recogen en nuestra Constitución. El profesor Gargarella, consciente de los inconvenientes que causan las protestas, concluye "que la protesta no es un derecho más. El derecho a criticar a las autoridades es reconocido como un 'superderecho', lo que yo llamo el primer derecho. Si se apaga la crítica al poder, la propia democracia resulta socavada, pierde sentido." *Íbid.*

Hanna Arendt, postulaba, que en el pensamiento griego, acción y discurso eran dos facultades que iban de la mano y eran las más elevadas de todas. La idea del 'animal político', estaría asociada en Aristóteles a la idea de definición del hombre como "ser vivo y capaz de discurso." El esclavo, de otra parte, sería aquel que está fuera del espacio donde se conjugan la acción y el discurso, no porque no tenga la facultad de hablar, sino porque el diálogo no constituye para él —como ocurre con los hombres libres— una preocupación primaria. Hanna Arendt, *La condición humana*, Editorial Paidós, Buenos Aires, 1993, págs. 39-41. Véase también, Soto Martínez, *op. cit.*, págs. 12-13, y n. 23. Por lo tanto, es ese debate robusto lo que hace de mujeres y hombres, seres verdaderamente libres. Es, lo que nos permite romper las cadenas de la esclavitud y del servilismo.

De otro lado, nuestro sistema democrático se debe preocupar por proteger no tan sólo a las mayorías, sino también a las minorías. "El sistema institucional, con los tremendos defectos que tiene, se diseñó para defender al mismo tiempo al gobierno y a la oposición. Una parte protege a la mayoría (a través de ramas políticas, que dependen del voto), y otra para que el crítico no quede desguarnecido (**a través de la Justicia, que no depende del voto**.) Esto no quiere decir que la Justicia avale cualquier tipo de crítica. **Pero si en vez de proteger a los críticos hasta último momento, los jueces buscan acallarlos, como suele ocurrir aquí, renuncian a su misión principal.**" Roberto Gargarella, La Justicia debe proteger la protesta y no acallarla, [www.pagina12.com.ar/diario/elpais/1-55110-2005-08-15.html](www.pagina12.com.ar/diario/elpais/1-55110-2005-08-15.html) (última visita 28 de diciembre de 2010). Son los jueces quienes, por estar ajenos al vaivén electoral, pueden ser escudo que protege y lanza que defiende los derechos de la minoría y del disidente.

Este Tribunal no puede fungir como un mandatario de la mayoría electoral. Sunstein, *op. cit.,* pág. 190 ("The Supreme Court, unlike elected officials, is not supposed to represent the electoral majority.") Nuestra misión es reconocer la importancia que para la vida misma en democracia tiene proteger el derecho a la expresión, la disidencia y a la protesta pacífica, así como protección de las minorías frente a los excesos de

la mayoría.   Porque en esto creo, me resulta por demás decepcionante y trágico observar el retroceso que ha supuesto el "nuevo" Tribunal.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada